Filed 11/26/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JARROD JOSEPH MILLER,<br><br>    Defendant and Appellant. | A135650<br><br>(Sonoma County<br>Super. Ct. No. SCR598331) |

Defendant and appellant Jarrod Joseph Miller (defendant) was convicted of first degree murder and residential burglary with firearm enhancements. Defendant contends that the trial court abused its discretion in precluding the defense expert psychologist from disclosing statements by defendant that appear in the report of another psychologist, which the expert relied upon in reaching his opinion that defendant has paranoid schizophrenia. In the published portion of this decision, we reject this argument. In the unpublished portion of this decision, we reject defendant's contentions the trial court erred in its instructions regarding imperfect self-defense and in permitting a member of the jail's mental health staff to testify as an expert at trial. We affirm the judgment below.

PROCEDURAL BACKGROUND

In November 2011, the Sonoma County District Attorney filed an information charging defendant with first degree murder (Pen. Code, § 187, subd. (a); count one) and residential burglary (Pen. Code, § 459; count two). The information alleged in connection with count one that defendant intentionally discharged a firearm causing

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III.

death (Pen. Code, § 12022.53, subd. (d)) and in count two that he personally used a firearm (Pen. Code, § 12022.5, subd. (a)).

In February 2012, a jury convicted defendant of both counts as charged and found the firearm use allegations true. In April, the trial court sentenced defendant to a prison term of 25-years to life on count one and a consecutive term of 25-years to life for the firearm use enhancement; the court stayed the sentence on count two.

FACTUAL BACKGROUND

The Prosecution Evidence

In or around the year 2009, defendant's sister, Amanda Miller,[1] and her boyfriend Tim Neuer moved from a rented house in Cloverdale to a residence in Healdsburg. Amanda and Neuer continued to rent the Cloverdale residence, where Amanda grew marijuana; Amanda testified it was for medical marijuana clubs. Neuer grew marijuana at the Healdsburg residence.

Defendant was living in Las Vegas; sometime in 2010 he told Amanda he was moving to Sonoma County and he asked whether he could stay with her for a couple of weeks. Defendant lived with Amanda and Neuer in Healdsburg for a few months. Eventually, Neuer became frustrated by defendant because defendant would frequently walk around at 3 or 4 in the morning and wake up Neuer. Neuer also felt defendant was not making enough of an effort to find another place to live. Amanda asked defendant to move out, but she allowed him to move to the Cloverdale residence because she did not want him to be homeless.

On the evening of March 8, 2011, Amanda and Neuer went to Cloverdale and visited with the owners of the Cloverdale house. Subsequently, they went to the house where defendant was staying. Amanda went to check on her marijuana plants, and Neuer talked with defendant. Neuer asked defendant in an agitated voice why defendant was still living there, called him a "mooch," and made other similar remarks. Defendant criticized Neuer about an incident during which Neuer called Amanda a "bitch."

---

[1] To avoid confusion between defendant and his sister, we will refer to Amanda Miller by her first name in this decision. No disrespect is intended.

Amanda and Neuer then returned to the Healdsburg house, arriving at about 10 p.m.; defendant stayed in Cloverdale.

Once back at the Healdsburg house, Neuer spent time with a friend, Ross Parent. Parent was cutting Neuer's hair in a bathroom and Amanda was on a couch watching television when defendant drove up to the house. He walked in and said he wanted to speak to Neuer; he sat next to Amanda on the couch when she explained Neuer was getting his hair cut. Neuer called out from the bathroom and said defendant should say whatever he wanted to say. Defendant calmly said he would wait until Neuer was done getting his hair cut.

According to Amanda's trial testimony, Neuer emerged from the bathroom after a few minutes and defendant asked Neuer to have a seat. Neuer, who had nothing in his hands, refused and told defendant to get out of the house.[2] Defendant then stood up and shot Neuer with a handgun. Neuer was over five feet away at the time. Amanda grabbed defendant but could not stop him from shooting a second and third time.[3] Then defendant told Amanda "It's going to be okay now, Mandy," and calmly walked out of the house. Deputy sheriffs responded to the scene and a paramedic determined Neuer was dead.

Amanda testified Neuer did not own any firearms. Neuer was tall and skinny; defendant was an inch or two shorter, but "[a] lot larger," due to going to the gym.

Shortly before 11:30 p.m. on the evening of the shooting, a deputy sheriff detained defendant after hearing a dispatch describing defendant's car. When asked, defendant indicated where his gun could be found, and a handgun was found on the side of the road in the area pointed out by defendant. Deputies located a backpack in defendant's car that contained firearm accessories and a plastic bag from a store in Nevada that contained a box of ammunition. Also in the bag was a receipt from the Nevada store dated March 5, 2011 for the purchase of a gun matching defendant's, as well as ammunition. The

---

[2] Parent testified that Neuer said, "Get the fuck out of my house."
[3] Parent testified that defendant stepped toward Neuer before shooting him a third time; Neuer was falling down and defendant aimed the gun at Neuer's head.

Nevada store was about 200 miles away.  A receipt in defendant's car showed he rented a car in San Francisco on March 5, 2011.

The Defense Evidence

The focus of the defense evidence was on defendant's mental health.  His mother testified that defendant's demeanor changed after, at the age of 17, a car he was driving was involved in an accident in which two of his friends were seriously injured.  Defendant was prescribed psychiatric medication, but he refused to take it and his mental health did not improve.  When defendant was 18 his uncle committed suicide, and defendant became completely withdrawn for four months, refusing to speak to anyone.

Defendant subsequently joined the Marines, but he went AWOL.  Later, defendant moved to Las Vegas, where he became homeless.  Defendant frequently sought money from various family members.

Dr. Thomas Cushing, an expert in forensic psychology, interviewed defendant for about seven hours, which included the administration of the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) assessment.  Dr. Cushing also reviewed other doctors' reports, an interview of defendant by law enforcement, and interviews of Amanda.  Dr. Cushing testified defendant's MMPI-2 scores were consistent with a diagnosis of paranoid schizophrenia, and paranoia was "the most persistent factor or condition of his mental illness."  A paranoid individual might have difficulty perceiving the degree of a threat and would deem a "perceived threat" to be a "real threat."  Stress or danger would heighten defendant's paranoia and could cause him to react impulsively to a perceived threat.  When a person acts impulsively, there is "not a lot of thinking or cognition or weighing or deliberating."  Defendant's results also showed "bizarre thinking," which "is consistent with an individual who is experiencing hallucinations and delusions.  In common language, they experience crazy thinking and crazy beliefs."  The data also indicated that defendant experienced both auditory and visual hallucinations, as well as delusionary thinking.

Dr. Cushing testified defendant "reported the auditory hallucinations, that Tim [Neuer] knew people who had guns and could take care of the problem, which

4

[defendant] believed was himself."[4]  Defendant also said he felt unsafe living at the Healdsburg and Cloverdale houses because of the marijuana production occurring there and traffic in the Healdsburg house from various individuals coming and going. Defendant's fears were consistent with his paranoia and the data obtained from the MMPI-2 assessment.  Notwithstanding defendant's mental illness, Dr. Cushing agreed defendant was capable of planning and deliberation, and he agreed various circumstances surrounding the shooting were indicative of planning and deliberation.

A narcotics detective testified there was a "very large" and "commercial" marijuana grow operation at the Healdsburg property, and violence is often associated with marijuana production.

Rebuttal Evidence

Dr. Dale McNeil, a psychologist specializing in forensic psychology and clinical neuropsychology, reviewed the results of defendant's MMPI-2 assessment.  He testified defendant's score on the "validity scales" indicated defendant was exaggerating symptoms of mental illness.  Dr. McNeil opined the MMPI-2 assessment was invalid and, therefore, the results could not be interpreted.  He stated, "You couldn't interpret the test results with confidence as being an accurate reflection of the respondent's personality based on the validity scales."

Stephen Leupold, a licensed therapist on the mental health staff at the jail where defendant was incarcerated, interviewed defendant when he entered the jail on March 9, 2011.  Leupold did not see "any signs or symptoms of psychosis during the interview." Leupold explained, "people who are psychotic, it becomes evident as you talk with them that they're looking at the world through a particular kind of a different lens and they don't make sense."  Defendant understood and responded appropriately to Leupold's questions.  Defendant had a flat affect; he acted as if he were in shock or wanted to be left alone.  Defendant was placed in an observation cell, and after several days he was

---

[4] The trial court advised the jury, "all this evidence that [defendant] related to Dr. Cushing is not coming in for the truth of the matter, only if Dr. Cushing relied on it for his opinion in this case."

5

transferred to the general population.  On cross examination, Leupold admitted he is not a licensed psychologist and did not administer a psychological assessment tool in evaluating defendant.  He also admitted that defendant was "wary and guarded," which was consistent with paranoid schizophrenia, and that defendant expressed the "irrational" belief that he would "be released after court tomorrow."

DISCUSSION

I.    *The Trial Court Did Not Abuse Its Discretion in Excluding Certain Out-of-court Statements From Dr. Cushing's Expert Testimony*

Defendant contends the trial court erred in precluding his expert witness, Dr. Cushing, from disclosing certain out-of-court statements by defendant found in a report prepared by another psychologist, Dr. Donald Apostle, where Dr. Cushing relied upon the report in formulating his opinion that defendant suffered from paranoid schizophrenia.[5] Dr. Apostle examined defendant at the end of 2011 at the request of the trial court, "in order to determine his sanity as of March 8, 2011."  At issue on appeal are defendant's statements to Dr. Apostle regarding the events surrounding the March 8 killing: defendant's statements he had the gun with him on March 8 for protection because of the large quantity of marijuana at the Healdsburg house; he intended only to talk with Neuer; he "snapped" when Neuer began " 'flipping out' with rage and yelling;" and he threw the gun away when he saw the police because he feared they would shoot him.

---

[5] The trial court ruled "[t]he experts for the defense will be permitted to refer to other doctors' reports . . . which they relied upon to formulate their opinions," but "the expert may not reveal the contents of those reports."  The court also ruled "the defense experts are precluded from discussing in front of the jury any statements made by the defendant to the expert about the events at or near the time of the commission of the crimes." Defendant's briefs on appeal reference reports of other psychologists and "preclusion of Dr. Cushing's reference in his testimony to things told to him by [defendant] with regard to the events and his mental state on the day of the shooting."  However, defendant fails to identify what specific statements were excluded by the trial court in those areas, and it is not possible to determine whether the court abused its discretion without the excluded evidence being identified.  (See *People v. Schmies* (1996) 44 Cal.App.4th 38, 53.) Defendant only references statements from Dr. Apostle's report in arguing he was prejudiced by the trial court's rulings.  Accordingly, the identified excluded statements from Dr. Apostle's report are the only possible basis for defendant's claim on appeal.

6

We review the trial court's rulings on the admission of expert testimony for abuse of discretion.  (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1122 (*Hill*).)  "The trial court's exercise of discretion will not be reversed on appeal except on a showing that that discretion was exercised in ' " 'an an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Ibid.*)  Defendant has the burden of establishing an abuse of discretion and resulting prejudice.  (*Ibid.*)

Evidence Code, section 801, subdivision (b),[6] permits expert opinion testimony on an opinion "[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the witness] testimony relates. . . ."  Section 802 permits "[a] witness testifying in the form of an opinion" to "state on direct examination the reasons for [their] opinion and the matter (including, in the case of an expert, [their] special knowledge, skill, experience, training, and education) upon which it is based, unless [the witness] is precluded by law from using such reasons or matter as a basis for [their] opinion."

In *People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*), the California Supreme Court explained that "any material that forms the basis of an expert's opinion testimony must be reliable.  [Citation.]  For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion.  Like a house built on sand, the expert's opinion is no better than the facts on which it is based.' "  *Gardeley* continued, "So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony.  [Citations.]  And because . . . section 802 allows an expert witness to 'state on direct examination the reasons for [the witness's] opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion."  (*Gardeley*, at p. 618.)

---

[6] All further undesignated statutory references are to the Evidence Code.

In particular, an expert may testify under section 802 about basis evidence consisting of out-of-court statements. In *People v. Catlin* (2001) 26 Cal.4th 81, 137, the court stated, " '[a]n expert may generally base [their] opinion on any "matter" known to [them], including hearsay not otherwise admissible. . . . [Citations.] On direct examination, the expert may explain the reasons for [the] opinions, including the matters [the expert] considered in forming them.' " (See also *Gardeley*, *supra*, 14 Cal.4th at pp. 618–619; *Hill*, *supra*, 191 Cal.App.4th at p. 1128 [listing cases]; *People v. Cooper* (2007) 148 Cal.App.4th 731, 746 ["[i]t is the long-standing rule in California that experts may rely upon and testify to the sources on which they base their opinions [citations], including hearsay of a type reasonably relied upon by professionals in the field."].)

However, "a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact." (*Gardeley*, *supra*, 14 Cal.4th at p. 619.) Accordingly, trial courts have long instructed juries that out-of-court statements related by experts as basis evidence may not be considered for the truth of the matter stated but only for the purpose of evaluating the expert's opinion. (See *People v. Montiel* (1993) 5 Cal.4th 877, 919 (*Montiel*) ["Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of [the] opinion and should not be considered for their truth."]; see also *Gardeley*, at p. 612 [trial court instructed jury that it " 'may not consider those [hearsay] statements for the truth of the matter, but only as they give rise . . . to the expert opinion in which questions will be asked which will follow' "].)

The courts have also recognized that the use of a limiting instruction is not always sufficient to alleviate the risk that jurors will use out-of-court statements admitted as expert basis evidence as independent proof on disputed factual issues. (*People v. Coleman* (1985) 38 Cal.3d 69, 92, disapproved on another ground in *People v. Riccardi* (2012) 54 Cal. 4th 758, 824, fn. 32.) Therefore, "California law gives the trial court discretion to weigh the probative value of inadmissible evidence relied upon by an expert witness as a partial basis for [the expert's] opinion against the risk that the jury might improperly consider it as independent proof of the facts recited therein." (*Coleman*, at p.

8

91; accord *People v. Bell* (2007) 40 Cal.4th 582, 608 (*Bell*); *Gardeley*, *supra*, 14 Cal.4th at p. 619.)  In particular, "the trial court must exercise its discretion pursuant to . . . section 352[7] in order to limit the [basis] evidence to its proper uses.  The exercise of this discretion may require exclusion of portions of inadmissible hearsay which were not related to the expert opinion.  [Citation.]  Or it may be necessary to sever portions of the testimony in order to protect the rights of the defendant without totally destroying the value of the expert witness' testimony.  [Citation.]  In still other cases where the risk of improper use of the hearsay outweighs its probative value as a basis for the expert opinion it may be necessary to exclude the evidence altogether." (*Coleman*, at pp. 92–93; accord *People v. Gonzales* (2011) 51 Cal.4th 894, 923; see also *Montiel*, *supra*, 5 Cal.4th at p. 919; *People v. Nicolaus* (1991) 54 Cal.3d 551, 582 ["It is well established that the court may, within its sound discretion, exclude the hearsay basis of an expert's opinion."]; *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524 [noting that, although experts are "given considerable leeway as to the material on which they may rely, the rules governing actual communication to the jury of any hearsay matter reasonably relied on by an expert are more restrictive"].)  "The discretion to exclude hearsay applies to defense, as well as prosecution, expert evidence." (*People v. Carpenter* (1997) 15 Cal.4th 312, 403, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096; 1106–1107.)

It is important to properly frame the inquiry in applying section 352 to out-of-court statements admitted as expert basis evidence.  "Within this context, 'probative value' refers to the relative reliability of the inadmissible evidence and its necessity to the jury's understanding of the credibility and [basis] for the expert opinion.  This must be weighed against the risk that the jury will view and use this inadmissible evidence for an improper purpose, i.e., as substantive evidence against the defendant." (*People v. Dean*

---

[7] Section 352 states:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

(2009) 174 Cal.App.4th 186, 199; see also *Coleman*, *supra*, 38 Cal.3d at p. 91; *Gardeley*, *supra*, 14 Cal.4th at p. 619.)

A majority of the justices of the United States and the California Supreme Courts have recognized that when an expert relies on hearsay basis evidence as true when forming an opinion and relates that basis evidence to the jury as true, the statements are admitted for their truth for purposes of the Confrontation Clause. (See *Williams v. Illinois* (2012) ___ U.S. ___, 132 S.Ct. 2221, 2256–2257 (conc. opn. of Thomas, J.); *id.* at p. 2272 (dis. opn. of Kagan, J.); *People v. Dungo* (2012) 55 Cal.4th 608, 627 (conc. opn. of Werdegar, J.); *id.* at p. 635, fn. 3 (dis. opn. of Corrigan, J.); see also *People v. Valadez* (2013) 220 Cal.App.4th 16, 31–32 [discussing various opinions in *Williams* and *Dungo*].) This conclusion rests on the insight that the jury, in evaluating expert testimony, will almost always assume or determine the truth of this basis evidence. (See, e.g., *Williams,* at p. 2257 (conc. opn. of Thomas, J.) [" 'To use the inadmissible information in evaluating the expert's testimony, the jury must make a preliminary judgment about whether this information is true.' "]; *Hill*, *supra*, 191 Cal.App.4th at pp. 1129–1131.)

This insight undermines cases like *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209–1210, that uphold the admissibility of hearsay basis evidence testified to by prosecution expert witnesses when challenged under the Confrontation Clause. However, it does not alter the longstanding interpretation of sections 801 and 802, which, as a matter of state law, permits an expert to testify to otherwise inadmissible hearsay basis evidence for the limited purpose of enabling the trier of fact to better evaluate the opinion. Nevertheless, in light of this insight in the Confrontation Clause cases, when the hearsay basis evidence is case specific, trial judges should be particularly hesitant to admit it. On the other hand, when the hearsay relates to the expertise of the witness—to their training, experience, and special knowledge in their field—courts should be far less inclined to utilize section 352 to exclude it. This is because there is a much greater risk that jurors will rely on case specific basis evidence as " 'independent proof' " (*Gardeley*, *supra*, 14 Cal.4th at p. 619) of a disputed factual issue at trial.

10

In the present case it is clear the exclusion of defendant's statements in Dr. Apostle's report was wholly appropriate.  As noted previously, defendant sought to have Dr. Cushing disclose at trial defendant's case specific statements to Dr. Apostle that he had the gun with him on March 8 for protection because he was afraid due to the large marijuana grow at the Healdsburg house; he intended only to talk with Neuer; he "snapped" when Neuer had begun " 'flipping out' with rage and yelling;" and he threw the gun when he saw the police because he feared they would shoot him.  All of those statements relate to the specific events at issue in the trial, and are directly relevant to the charge of premeditated murder and the defense theory that defendant acted in imperfect self-defense.  Because of this overlap between the basis evidence and the disputed issues at trial, there was a substantial risk the jury would consider defendant's out-of-court statements as independent proof of what happened the night of the shooting.  Moreover, defendant's out-of-court statements were unreliable—a self-serving substitute for trial testimony tested "in the crucible of cross-examination."  (*Crawford v. Washington* (2004) 541 U.S. 36, 61; see also *Bell*, *supra*, 40 Cal.4th at p. 608; *People v. Pollock* (2004) 32 Cal.4th 1153, 1172; *People v. Yuksel* (2012) 207 Cal.App.4th 850, 857.)  The hearsay had little "proper probative value" (*Montiel*, *supra*, 5 Cal.4th at p. 919) because Dr. Cushing was permitted to testify to a substantial body of other information underlying his diagnosis of paranoid schizophrenia.  Defendant fails to cite to any portion of the record showing that the hearsay in Dr. Apostle's report was important information that the jury needed to consider to be able to evaluate Dr. Cushing's opinion.

The California Supreme Court's decision in *Bell*, *supra*, 40 Cal.4th 582 is on point.  There, the trial court excluded under section 352 proposed testimony by a defense psychologist recounting the defendant's statements about the murder on trial.  (*Id.* at p. 607.)  The trial court permitted the expert to testify to the defendant's statements about his " 'psychological background,' " but the court reasoned that "a limiting instruction would be insufficient to prevent the jury from considering defendant's statements about the crimes themselves . . . as evidence of the truth of the events, effectively permitting defendant to testify to his version of events without being subject to cross-examination.

11

The potential for such prejudice was less as to defendant's psychological history, the court found, because that issue was less central to the case." (*Id.* at p. 608.) The Supreme Court affirmed, explaining, "Though the excluded statements were not particularly inflammatory, for the jury to separate their proper and improper uses would have been difficult." (*Id.* at p. 609.) Thus, under *Bell*, out-of-court statements about the crime at trial offered as expert basis evidence should commonly be excluded under section 352. (See *People v. Hughes* (2002) 27 Cal.4th 287, 338–339 [no abuse of discretion to preclude expert from disclosing as basis evidence defendant's statements to defense investigator about charged offense, which differed from his statements to the police].)

The trial court did not abuse its discretion in precluding Dr. Cushing from testifying to defendant's statements related in Dr. Apostle's report.[8]

II.    *The Trial Court Did Not Err In Precluding Argument That Defendant Acted in Imperfect Self-Defense Due to His Paranoid Schizophrenia*

"A killing committed because of an unreasonable belief in the need for self-defense is voluntary manslaughter, not murder. 'Unreasonable self-defense, also called imperfect self-defense, "obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand." ' " (*People v. Elmore* (2014) 59 Cal.4th 121, 129–130 (*Elmore*).) In the present case, the trial court instructed the jury on that

---

[8] We reject the People's assertion that defendant's statements to Dr. Apostle were properly excluded under *People v. Campos* (1995) 32 Cal.App.4th 304, 308 (*Campos*), which states, "An expert witness may not, on direct examination, reveal the content of reports prepared or opinions expressed by nontestifying experts." In support of that blanket assertion, *Campos* cited *Whitfield v. Roth* (1974) 10 Cal.3d 874, 894 (*Whitfield*). However, as explained in *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1326, "*Campos* and *Whitfield* were concerned with preventing the introduction of multiple opinions, insulated from cross-examination, into evidence. Since this concern does not arise unless the expert is relying on other expert opinions, the reasoning of those cases is confined to that situation." Here, Dr. Cushing did not rely on Dr. Apostle's opinion concerning defendant, only on his notes of what defendant said. *Campos* is therefore distinguishable.

imperfect self-defense theory of voluntary manslaughter pursuant to CALCRIM No. 571. The court instructed the jury in part that defendant "acted in imperfect self defense if:[¶] One, the defendant actually believed that he was in imminent danger of being killed and suffering great bodily injury; and two, the defendant actually believed the immediate use of deadly force was necessary to defend against the danger; but three; at least one of those beliefs was unreasonable."

Defendant contends other instructions given by the trial court were in error because they precluded the jury from considering the evidence of defendant's mental illness in deciding whether defendant acted in imperfect self-defense. In particular, the court instructed the jury pursuant to CALCRIM No. 627 that evidence of hallucinations could be considered "in deciding whether the defendant acted with deliberation and premeditation." The court also instructed the jury pursuant to CALCRIM No. 3428 that the evidence of defendant's mental disorder could be considered "only for the limited purpose of deciding whether at the time of the charged crime the defendant acted with the intent or mental state required for that crime. The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state: Specifically, premeditation and deliberation as it applies to murder in the first degree."

Defendant's claim of error is foreclosed by the California Supreme Court's recent decision in *Elmore*, *supra*, 59 Cal.4th 121. There, the court decided the imperfect self-defense theory is not applicable "when belief in the need to defend oneself is entirely delusional. . . . A purely delusional belief in the need to act in self-defense may be raised as a defense, but that defense is insanity. Under our statutory scheme, a claim of insanity is reserved for a separate phase of trial. At a trial on the question of guilt, the defendant may not claim unreasonable self-defense based on insane delusion." (*Id.* at p. 130.)

Defendant argues *Elmore* is distinguishable because his fears had "roots in reality." We disagree. As explained in *Elmore*, "California cases reflect the understanding that unreasonable self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance alone." (*Elmore*, *supra*, 59

13

Cal.4th at p. 134; see also *id.* at p. 136 ["unreasonable self-defense has been deemed to apply when the defendant's act was ' "*caused by the circumstances*," ' rather than by cognitive defects alone"].) Defendant fails to identify any objective circumstances supporting his purported belief that he was in imminent danger or that immediate force was necessary to defend against the danger. The only arguably relevant circumstances shown by admissible evidence[9] were that Neuer was angry with defendant and a grower of marijuana. However, any belief in the need to respond to those circumstances with deadly force was "purely delusional." (*Id.*, at p. 130.) Because defendant's claim of imperfect self-defense is rooted in a delusional reality born entirely of his paranoia, and not founded upon any physically threatening conduct by Neuer shown by evidence in the record, the trial court's instructions were proper.

In any event, any error in precluding the jury from considering the evidence of defendant's mental illness in deciding whether defendant acted in imperfect self-defense was harmless under any standard of prejudice. The peril necessary to support a finding of imperfect self-defense " ' "must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with*." ' " (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) In the present case, there was no evidence that defendant actually believed he was in immediate danger. Defendant's hearsay statements about his fear of Neuer could not be considered by the jury as independent evidence on the issue of imperfect self-defense. In any event, evidence that defendant feared Neuer is not evidence that defendant felt he was in *imminent* peril at the time of the shooting. Indeed, there was *no* evidence defendant faced any imminent danger at the time of the shooting—Neuer had nothing in his hands when he walked into the living room, made no verbal threat or threatening gesture, and was several feet away when defendant started shooting. The jury may have found defendant's paranoia led him to react impulsively, or to believe Neuer presented a

---

[9] Defendant's out-of-court statements to Dr. Cushing about his fear of Neuer were admissible only to explain Dr. Cushing's opinion; they could not be considered by the jury as independent evidence on the voluntary manslaughter offense. (See Part I, *ante*.)

general threat to his safety, but there is no basis to conclude the jury might have found defendant actually believed he was in *imminent* danger. Any error was harmless.

III. *The Trial Court Did Not Abuse Its Discretion In Permitting Leupold To Testify as an Expert*

Defendant contends the trial court erred in permitting Leupold, a member of the jail mental health staff who interviewed defendant on March 9, 2011, to testify as an expert on diagnosis of mental illness and offer his opinion as to whether defendant was suffering from a "major mental illness" at the time of his arrival at the jail.

The trial court held a section 402 hearing to determine whether Leupold could qualify as an expert. Leupold testified he has a bachelor's degree in psychology and a masters degree in counseling and psychology. He is a licensed marriage and family therapist, but not a licensed psychologist. He did 3,000 hours of internships before becoming licensed. He had been on the mental health staff at the jail where defendant was incarcerated for seven years. At the jail, Leupold would perform assessments of new inmates to determine whether they have a "major mental disorder." He was trained to observe inmates and document their mental health status, and he was trained in the use of the DSM-4 for diagnosis. Leupold received "on-the-job training" at the jail, where he worked with two psychiatrists. He assessed inmates using a four-page form, but did not do any other diagnostic testing. He regularly saw inmates with schizophrenia at the jail.

The court allowed Leupold "to testify in regards to his observations and diagnosis." The court reasoned that, although Leupold's "education might be somewhat lacking," his "experience and training" was impressive. The court continued, "He's spent seven years in the jail facility. He's done about 20 evaluations a week . . . over a seven-year period. He's familiar with the DSM-4 and the predecessors of those particular books. He's familiar with the Axis one, two, three, and four diagnosis." The court concluded by stating, "he may not have the degree from a prestigious university that gives him that step up in regard to education, but he certainly had the practical experience. He's had training in regard to that. So I'll deem him an expert. He can

15

testify to the reasonableness of why he's basing his opinions. And . . . he's subject to full cross-examination."

" 'As a general rule, a trial court has wide discretion to admit or exclude expert testimony. [Citations.] An appellate court may not interfere with the exercise of that discretion unless it is clearly abused.' " (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) An abuse of discretion will be found only where " 'the evidence shows that a witness *clearly lacks* qualification as an expert.' " (*People v. Chavez* (1985) 39 Cal.3d 823, 828.)

The trial court did not abuse its discretion. Although Leupold's education was not comparable to that of Dr. Cushing or Dr. McNeil, he was trained during his schooling, licensure process, and seven years at the jail in diagnosing mental illness. He had regularly observed schizophrenics at the jail. Leupold certainly did not have the amount of exposure to defendant that Dr. Cushing did, and Leupold did not employ as thorough an assessment tool as Dr. Cushing. However, those were matters defendant's counsel could explore on cross-examination, and there is no reason to doubt that the jury was able to understand the particular context in which Leupold made his assessment. Leupold was qualified to opine whether defendant suffered from a major mental illness; defendant's criticisms of Leupold's qualifications go to the weight due his opinion rather than to his qualifications to testify as an expert. (*People v. Bolin* (1998) 18 Cal.4th 297, 321–322 [" ' "Where a witness has disclosed sufficient knowledge of the subject to entitle [their] opinion to go to the jury, the question of the degree of [their] knowledge goes more to the weight of the evidence than to its admissibility." ' "]; accord *People v. Eubanks* (2011) 53 Cal.4th 110, 140.) The trial court did not abuse its discretion.

### DISPOSITION

The trial court's judgment is affirmed.

16

_____

SIMONS, Acting P.J.

We concur.

_____

NEEDHAM, J.

_____

BRUINIERS, J.

(A135650)

Superior Court of Sonoma County, No. SCR598331, Hon. Kenneth J. Gnoss, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Jeffrey M. Laurence and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.