Filed 4/10/15  P. v. Ashley CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>HORACE ASHLEY,<br><br>　　　Defendant and Appellant. | A141374<br><br>(Alameda County<br>Super. Ct. No. 74419) |

**INTRODUCTION**

Defendant Horace Ashley appeals from the extension of his civil commitment for two years pursuant to Penal Code section 1026.5, subdivision (b)(1).[1]  He asserts the trial court violated his statutory right to not be compelled to testify against himself when it permitted the prosecutor to call him as a witness during the People's case-in-chief.  We agree.  (*Hudec v. Superior Court* (2015) 60 Cal.4th 815 (*Hudec*).) However, we find the error harmless.  (*People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).)

Defendant also challenges Dr. Tierney's reliance on hearsay statements as the basis for her expert opinion.  The question whether such reliance violates a criminal defendant's confrontation rights is currently pending before the California Supreme

---

[1]　All further unspecified statutory references are to the Penal Code.

Court.[2] However, at the present time we are constrained by principles of stare decisis to follow existing law, which rejects defendant's argument. (See *People v. Rodriguez* (2012) 58 Cal.4th 587, *People v. Gardeley* (1996) 14 Cal.4th 605; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127-1128.) We affirm.

## PROCEDURAL HISTORY[3]

"On February 17, 1982, defendant assaulted the victim Carlos Corona with an axe.

"On August 4, 1982, defendant pleaded guilty to one count of assault with a deadly weapon (§ 245, subd. (a)) and admitted to a use clause and a great bodily injury clause. The trial court concluded he was insane at the time of the commission of the offense and found him not guilty by reason of insanity (NGI). (§ 1026.)

"On August 25, 1982, defendant was committed to Atascadero State Hospital for a maximum term of seven years. (§ 1026.5, subd. (a)(1).) He was subsequently transferred to Napa State Hospital (NSH).

"On November 27, 1984, a jury found defendant was not restored to sanity in that he remained a danger to the health and safety of others. (§ 1026.2.)

"On August 19, 1991, the People filed a petition and affidavit for commitment beyond the prescribed term. [Fn. omitted] (§ 1026.5.)

"In 1994, defendant was released on a Conditional Release Program (CONREP) for about seven months. He started experiencing the same symptoms that had appeared at the time of his underlying offense. His CONREP status was revoked in 1995.

"On February 18, 2010, defendant's commitment was extended for two years, until March 1, 2012. (§ 1026.5, subd. (b)(8).) The trial court found defendant continued

---

[2]  See *People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S218640, and *People v. Archuleta* (Apr. 11, 2014, E049095) [nonpub. opn.], review granted June 11, 2014, S218640).

[3]  On our own motion, we take judicial notice of our prior unpublished opinion in *People v. Horace Ashley* (Nov. 14, 2012, A134482 [nonpub. opn.] (*Ashley I*)).

to suffer from paranoid schizophrenia and posed a substantial danger of physical harm to others.

"On October 6, 2011, the People moved for another two-year extension of commitment pursuant to section 1026.5, requesting an extension until March 1, 2014." (*Ashley I*, *supra*, A134482, at pp. *1-*2.)

"On January 24, 2012, a contested hearing was held on the People's recommitment request." (*Ashley I*, *supra*, A134482, at p. *2.)

"At the conclusion of the bench trial, the trial court found defendant to be a substantial danger to himself and to others, and granted the two-year extension on his commitment." (*Ashley I*, *supra*, A134482, at p. *6)

This court affirmed the judgment on November 14, 2012.

On February 21, 2014, the People filed a petition for recommitment. (§ 1026.5) Defendant waived jury trial, and on March 19, 2014, a contested hearing was held at which Dr. Helen Tierney and defendant testified. On March 20, 2014, the trial court found defendant posed a substantial danger to himself and to others as a result of his mental illness and extended the commitment to March 1, 2016. This appeal followed.

## STATEMENT OF THE FACTS

Dr. Helen Tierney graduated from medical school in 1980 and became board certified in psychiatry in 1994. At the time she testified at defendant's recommitment hearing, she had been the Chief Psychiatrist at Napa State Hospital for one and one-half years, after having served as a staff psychiatrist there since 2008. She testified as an expert in psychiatry qualified to render an opinion under sections 1026 through 1026.5 pertaining to the evaluation of persons as not guilty by reason of insanity.

*Bases for Opinion*

On September 5, 2013, Dr. Tierney interviewed defendant for 20 to 30 minutes for the purpose of providing the court a report on the proposed extension of defendant's commitment pursuant to section 1026.5. In addition to interviewing defendant,

3

Dr. Tierney reviewed defendant's progress notes, an incident report for an event in the dining hall on August 17, 2013, interdisciplinary notes provided by nurses, social workers and rehabilitation workers, the psychiatric progress notes, police reports and information regarding his criminal history, information in documents related to prior releases from the hospital in 1990 and 1994 through CONREP, defendant's wellness and recovery plan, a CONREP report dated October 2013, a 1982 report by a Dr. Edison relating to the recommendation that defendant be sent to Atascadero State Hospital, Dr. John Gary's progress notes, Dr. Vertmont's progress report, and a Forensic Relapse Prevention Plan. She also spoke with Dr. Steven Hurbert.

### Defendant's Diagnoses

Dr. Tierney opined defendant has a mental disorder, is a substantial risk of physical harm to others, and has difficulty controlling his reactions to his symptoms.

According to Dr. Tierney, defendant has diagnoses of chronic paranoid schizophrenia and antisocial personality disorder. Her conclusion defendant suffers from paranoid schizophrenia was based on clinical interview and review of records.

### Chronic Paranoid Schizophrenia

A diagnosis of schizophrenia involves "looking for a pattern over time," rather than one clinical interview. In defendant's case, the records and interviews documented consistent descriptions of persistent grandiose and persecutory delusions about political conspiracies, sexual themes, and "ideas of reference [and] thought disorder."

### Defendant's Symptoms

Defendant has had "a persistent idea that he has been destined for greatness, . . . there are forces that wish to propel him into a . . . significant political career. He has believed that people are plotting against him. [H]e's had symptoms where people have made gestures and he has believed . . . that means they're referring to . . . celibacy."

Dr. Tierney characterized defendant's thinking during her interview of him as "derailed"—meaning "there is a loss of sequencing of ideas so that . . . although each

4

sentence might seem coherent, . . . when one sentence is placed next to the other, one has difficulty understanding the connection between the ideas.  So the thought trajectory is broken."   This is a form of thought disorder.

Over defense objection, Dr. Tierney's report included examples of defendant's derailed thinking taken from Dr. Hurbert's interview with defendant.  These examples formed a part of the basis for her opinion defendant suffers from paranoid schizophrenia, chronic type.  For example, when asked about his mood, defendant replied, "Good . . . I'm satisfied with my thinking, just worried about the constitution overthrown [*sic*].  There is a movement to overthrow it been going on since 1913."   Hurbert's written report quoted some examples showing defendant's derailed thinking.

Dr. Tierney also directly observed defendant's derailed thinking during her interview with him the previous summer.  During this interview, defendant "referenced this again, uh, believing that others were wishing him to have high office, . . . but he was wanting not to follow through on that."  On September 5, 2013, defendant told Dr. Tierney that he wrote and mailed a 12-page letter to Steve Forbes.  "He said the content was related to what things would be like if we had a Palen [*sic*] administration."  Defendant also said, "I've always believed I'm destined for greatness."

Dr. Tierney also testified about a similar example found in defendant's Forensic Relapse Prevention Plan.  When asked about remaining in the hospital versus being in the community, defendant responded:  "If I can't escape I'm prone to commit violence.  As long as I can stay with females and friends, I'm okay.  People forcing me to have some kind of relationship I don't what to have.  [I]f released, [I] would take advantage of people like a rock star takes advantage of people."

Defendant's persecutory delusion was illustrated by an incident in the dining hall described in an August 2013 incident report.  Another patient was flipping trays; defendant intervened to stop the patient by punching him three times in the head.  Defendant explained he believed the person he attacked was going to assault a staff

5

person, but the assault was related to someone setting defendant up, and somehow involved Filipinos and people who voted for Obama.[4]

*Offense Facts*

At the time Dr. Tierney wrote her report, she was aware defendant was seen entering an elevator and leaving the lobby. A witness saw the victim on the elevator floor calling for help. Defendant had hit the victim twice on the head with an axe. The second blow with the axe severed several of the victim's fingers. Defendant attacked the hotel clerk because he grabbed his own crotch. According to Dr. Tierney, the hotel clerk's actions represented to Mr. Ashley that he should fornicate or get married and that everybody wanted him to fornicate, that San Francisco and the Bay Area expected him to be a leader, and that he was surrounded by people grabbing their crotches. Defendant believed people on the street were talking about him and wanted him to run for political office, but would then assassinate him. Defendant believed people in San Francisco and the Bay Area were conspiring against him.

Dr. Tierney created a progress note dated September 15, 2013, chronicling her interview with defendant. When defendant talked to Dr. Tierney about the predicate offense, he said he struck the hotel clerk with a "hatchet." Other than using the word "hatchet" instead of "axe," the description of the offense he gave her during the interview was the same as the description documented in her report. Defendant expressed some remorse about his behavior during the underlying offense. He told her: "The person I hit wasn't the one responsible for my unhappiness; it was someone else directing this."

---

[4]    An additional recent assaultive incident was documented in Dr. Tierney's report of June 8, 2013. Defendant had a physical altercation with another individual in the dining hall. There were no injuries. However, the next day, defendant was found in possession of metal paperclips, which are considered contraband, because with enough of them, they can be used to construct a weapon.

*Defendant Is In Partial Remission*

Dr. Tierney opined defendant's schizophrenia paranoid type was in "partial remission," in that "over recent years in the documentation, there is no mention of active hallucinations." However, Dr. Tierney found continued persecutory delusions and a mild thought disorder.

*Antisocial Personality Disorder*

Dr. Tierney described antisocial personality disorder as "a pervasive pattern for the disregard of the rights of others . . . often beginning in childhood or early adolescents [*sic*] and persisting into adulthood." Impulsivity is also a component of the diagnosis. In defendant's case, the records described an episode of animal cruelty, fighting in school, putting lighted lighter fluid in a mailbox slot for fun at the age of 11 or 12, and shooting at a car at the age of 16. He was placed in the California Youth Authority (now called the Division of Juvenile Justice). At the age of 22 he was arrested for hitting a police officer. He had little remorse and there was evidence of lying. There is no indication in the records that any of these incidents occurred while defendant was intoxicated, or that they were related to a mental disorder.

*Dangerousness*

Dr. Tierney opined defendant represented "a substantial danger" of physical harm to others as a result of his mental disorders. Risk factors included: (1) defendant's history, from a very early age, of violent and dangerous acts; (2) his current "active symptoms" of mental illness, consisting of persistent delusions and impulsivity that contributed to the dining hall incident in August 2013; (3) his lack of insight into his mental disorder and dangerousness, which "indicates that following through with treatment recommendations and plans is less likely to occur"; and (4) the lack of feasibility of defendant's Wellness Plan for himself. In addition, the fact that defendant continues to suffer from the delusions that were a part of illness at the time of the underlying offense is "very concerning."

7

Defendant currently takes the psychotropic medication Risperidone. He is "passively compliant" with his medications for mental illness, but lacks the capacity to consent to medications. In Dr. Tierney's opinion, defendant would not take his medications outside of a secure setting like the hospital, due to his lack of insight.

Defendant completed a Forensic Relapse Prevention Plan on August 29, 2013. At page 17, the form asks, "What action have you taken while hospitalized in order not to relapse or reoffend while in the hospital/community?" Defendant responded in writing: "My incessant struggle to gain insights into the reasons for my abhorrent behaviors that makes sense to the evolutionary biology. This insight can only be validated if it makes absolute sense in the events of learned human history." Dr. Tierney did not understand appellant's answer and opined it demonstrated his derailed thinking. Typically, a patient might say, "I make sure I take my medications" or "I will go to a clinic."

On page 32, under the section entitled "High Risk Situations that Can Lead to: Mental Health Issues," defendant wrote: "I recently saw a news broadcast where a woman had been knocked down and robbed of her purse and laptop by a black man that looked like me. Then he turned around, came back, and kicked the woman in her face, leaving her unconscious. This was a hate crime, if I ever saw one. [¶] Had I been present at the scene, it would have been very likely that I would have acted with excessive force to the point where I would have been criminal." To Dr. Tierney, this answer indicated defendant saw "himself as intervening and using excessive force."

On page 36, under the section entitled "High Risk Situations that Can Lead to: Criminal Behavior," defendant wrote: "A police officer was gunned down around the corner from the board and care [where] I was living in Oakland. The suspect fled on foot. Had I been there at the scene, I would have seized the fallen officer's gun and pursued the suspect with the intention of wounding him with a head shot. That would [illegible] been a criminal act." Dr. Tierney found this answer "significant" because defendant's "solution to a problem is linked with a violent act and intervening in situations personally

8

without getting ancillary help. When someone is discharged from the hospital, you would like them to incorporate a number of people and non-violent strategies when placed in stressful situations."

The forensic self-evaluation on page 10 is designed to help the patient identify the situations and symptoms that contributed to the committing offense. In Dr. Tierney's view, defendant's response showed he was "still delusional . . . about the instant offense." Defendant wrote: "I was engaged in psychological warfare with American society. They seemed to be highly perturbed by my lack of any kind of sex life. [¶] In their desperation, the men would take to the behavior of grabbing their crotches whenever they came into my view. One day I got so fed up with the despicable behavior that I pulled down my pants and exposed myself to a tormentor. The vulgar behavior stopped for a period of five months. [¶] My conflicting sexual values began in earnest in 1980 when Ronald Reagan became president. I did a tiny amount of campaign work for Reagan. When he won the election, I felt relieved of the great burden thus no longer was politic [*sic*] ambitious. [¶] I started college studying physics, mathematics and chemistry. I planned to find sufficient loopholes in nature that would enable me [to] permanently end the arm's race without the dread of being famous. I received no support from anyone in this; there were just women everywhere available to me, and in the public's disgust over my celibacy, they resurged in tormenting me. On February 24th I attacked the last tormentor, Carlos Carona. He was only an innocent stooge used by society to hurt me, not aware of the enormous pain they were causing me."

At page 39, under the section entitled "Crisis Plan," defendant responded: "If I entered a state where I went beyond an early warning sign, I would immediately go to the nearest hospital like the CONREP office if it [is] not too far or too late at night to check in as a boarder. I would also think that calling my social worker on the board and care phone to let [illegible] know that I have symptoms beyond early warning.

9

Under no circumstances should I try to wait it out or rely on soluprous [*sic*] tactics of my own design." In Dr. Tierney's opinion, this was not a sufficient crisis plan because, on page 26, defendant identified as his "early warning sign," a "general and inexplicable unhappiness." He did not mention any other medical symptoms in his early warning signs. "He has not integrated other symptoms."

Dr. Tierney opined defendant continues to have difficulty controlling his actions. In her view, defendant could not be successfully treated in a conditional release program.

***Defendant's Testimony***

Defendant was called as a witness over his counsel's objection. Defendant disagrees with his present diagnosis of paranoid schizophrenia. He has never, to his knowledge, experienced delusions. Defendant did not know if he understood the symptoms of a personality disorder, but he also disagrees he has a personality disorder. Defendant admitted he is "always paranoid about the doctors and the social workers" at Napa and was "a little afraid of them" because they spread the lie to the student attorneys in the self-help center that patients do not have the right to refuse psychotropic medications. Defendant does not like Risperdal "very much," and he did not need it, but he took it "because they wanted me to."

The trial court sustained the petition, and extended defendant's commitment for two years, until March 1, 2016. This timely appeal follows.

10

## DISCUSSION

### 1. Defendant's Statutory Right to Refuse to Testify Was Violated, But the Error is Harmless under the *Watson* Standard.

In his opening brief, defendant argued the court violated his statutory right to not testify in an official proceeding. (§ 1026.5, subd. (b)(7).)[5] While he acknowledged the split in the Courts of Appeal on this question, he urged this court to follow *People v. Haynie* (2004) 116 Cal.App.4th 1224 (*Haynie*), which supported his position. The Attorney General, relying on *People v. Lopez* (2006) 137 Cal.App.4th 1099, overruled in part in *People v. Hudec*, *supra*, 60 Cal.4th at p. 832, argued defendant had no such statutory right.

After briefing was complete, our Supreme Court decided *Hudec, supra*, 60 Cal.4th 815. We requested supplemental briefing, inviting the parties to address the effect, if any, of *Hudec* on the question whether defendant had a right to refuse to testify at his recommitment hearing and, if so, whether reversal of the commitment order is required under *People v. Watson, supra*, 46 Cal.2d 818 or *Chapman v. California* (1967) 386 U.S. 18.

The parties agree, and we concur, *Hudec* resolves the conflict in the Courts of Appeal in defendant's favor. Section 1026.5, subdivision (b)(7) provides in pertinent part that a person committed to a state hospital or other treatment facility pursuant to section 1026.5 [hereafter NGI committee] "shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees." In *Hudec*, our Supreme Court held this provision guarantees an NGI committee "the statutory right not to testify at his or her NGI commitment extension hearing. On its face, the language of section

---

[5] Section 1026.5, subdivision (b)(7) provides in relevant part: "The person [committed as NGI] shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees."

11

1026.5[, subd.] (b)(7) provides respondents in commitment extension hearings the rights constitutionally enjoyed by criminal defendants. One of those rights is the right to refuse to testify in the prosecution's case-in-chief. [Citation.] And while the appellate courts have posited a number of restrictions on the rights included under section 1026.5[, subd.] (b)(7), we find none of those possible restrictions justifies excluding the right not to testify against oneself." (*Hudec, supra*, 60 Cal.4th at p. 826.)

Because *Hudec* arose in the context of pretrial writ proceeding, the court was not called upon to address harmless error standards. The Court of Appeal in *Haynie, supra*, 116 Cal.App.4th 1224, reversed the trial court's order extending Haynie's commitment after a hearing. The *Haynie* court reasoned: "The right to not be compelled to testify against oneself is clearly and relevantly implicated when a person is called by the state to testify in a proceeding to recommit him or her even if what is said on the witness stand is not per se incriminating. By calling the person in its case-in-chief, the state is essentially saying that his or her testimony is necessary for the state to prove its case. We have no doubt that a committee so compelled to testify is prejudiced under these circumstances. The California Supreme Court noted in *Cramer v. Tyars* (1979) 23 Cal.3d 131, that permitting the jury to observe the person sought to be committed and to hear him speak and respond provided 'the most reliable proof and probative indicator of the person's present mental condition.' (*Id.* at p. 139.) As such, we cannot conclude that compelling Haynie to testify, even if his testimony was in some regards cumulative to that of other witnesses, was harmless error." (*Haynie, supra*, 116 Cal.App.4th at p. 1230.)

Defendant argues, "*Haynie*'s holding appears to suggest that being forced to testify against oneself may be seen as a 'structural error' that is reversible per se." We disagree. The *Haynie* court's stated conclusion is that the error was harmless, suggesting to us the court found the error subject to harmless error analysis, although it did not identify the standard it used. *Haynie* is not support for the proposition *Hudec* error is structural.

12

*Arizona v. Fulminante* (1991) 499 U.S. 279 (*Fulminante*) defined structural errors as "structural defects in the constitution of the trial mechanism," such as the total deprivation of the right to counsel at trial and trial before an impartial judge, both of which defy analysis by harmless error standards. (*Id*. at p. 309-310.) Other structural errors identified by *Fulminante* include the unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, and denial of the right to a public trial. (*Id*. at p. 310.) "Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. 'Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' [Citation.]" (*Ibid*.)

By contrast, the *Fulminante* court classified the admission of an involuntary confession as trial error, "similar in both degree and kind to the erroneous admission of other types of evidence. The evidentiary impact of an involuntary confession, and its effect upon the composition of the record, is indistinguishable from that of a confession obtained in violation of the Sixth Amendment—of evidence seized in violation of the Fourth Amendment—or of a prosecutor's improper comment on a defendant's silence at trial in violation of the Fifth Amendment. When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt." (*Fulminante, supra*, 499 U.S. at p. 310.)

In our view, the impact of the error here is also indistinguishable from other evidentiary trial errors and is similarly amenable to harmless error review.

Defendant also argues the prejudicial impact of the error should be assessed under *Chapman*'s harmless-beyond-a-reasonable doubt standard for federal constitutional error

13

because "the State violated its own procedures with respect to appellant's statutory self incrimination rights (*Hicks v. Oklahoma* (1980) 447 U.S. 343) and because civil commitment for any purpose constitutes a 'significant deprivation of liberty that requires due process protection' (*Addington v. Texas* (1979) 441 U.S. 418)." Our Supreme Court has repeatedly rejected the argument that violation of state-created rights constitutes deprivation of a criminal defendant's "liberty interest" under *Hicks v. Oklahoma, supra,* 447 U.S. 343, 346. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 195; *People v. Boyette* (2002) 29 Cal.4th 381, 419; *People v. Epps* (2001) 25 Cal.4th 19, 29; see also *Rivera v. Illinois* (2009) 556 U.S. 148, 158 ["The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.' "]; *Engle v. Isaac* (1982) 456 U.S. 107, 121, fn. 21 ["We have long recognized that a 'mere error of state law' is not a denial of due process. [Citation.] If the contrary were true, then 'every erroneous decision by a state court on state law would come [to this Court] as a federal constitutional question.' [Citations.]"]. In our view, *Hicks* does not transform transgression of the state-created right at issue here into a federal due process violation. Similarly, *Addington*—which addressed the standard of proof in a civil commitment proceeding—does not transform every error committed in a civil commitment proceeding into a due process violation. We are not persuaded the *Chapman* test applies here.

The People argue *Watson*'s reasonable probability standard applies here, and we agree. In *People v. Epps, supra*, 25 Cal.4th 19, our Supreme Court determined the *Watson* standard of reversal applied to denial of a criminal defendant's statutory right to a jury trial on a prior conviction (§ 1025). (*Epps, supra*, 25 Cal.4th at p. 29.) In our view, the purely statutory right to a jury trial on a prior conviction at issue in *Epps* is similar to the purely statutory right to refuse to testify in a civil commitment proceedings in that neither right is guaranteed by the federal Constitution. (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 488-489 [no Sixth Amendment right to jury trial on prior conviction];

14

*Allen v. Illinois* (1986) 478 U.S. 364, 368-375 [no Fifth Amendment guarantee against compulsory self-incrimination under Illinois Sexually Dangerous Persons Act]. See *Hudec*, *supra*, 60 Cal.4th at pp. 819-820, fn. 2.) Violation of each right is state law error, which is reversible only upon a showing of a miscarriage of justice (Cal. Const., art VI, § 13) as interpreted in *Watson, supra*, 46 Cal.2d 818. Accordingly, we hold the *Watson* standard applies to denial of an NGI committee's statutory right to refuse to testify at a commitment hearing.

Defendant argues reversal is warranted under the *Watson* standard because there is a reasonable probability a result more favorable to defendant would have been reached if defendant had not testified. Defendant contends his testimony would have made a fact finder think he was so different or strange that he must be dangerous, whereas Dr. Tierney's testimony was "highly problematic," in that she "admitted on cross-examination that she failed to use any bona fide actuarial instrument in assessing [him], and that such unaided assessments were less accurate than a coin-toss."

It is true Dr. Tierney answered "no" when asked if she used "any sort of actuarial device" to assess defendant's risk of harm. She was then asked if she was "familiar with studies that indicate that unaided clinical judgment is less accurate than a coin toss in terms of accuracy." She said she was familiar, but when asked if she agreed with the statement embedded in the question, she answered she had not read all the literature, did not know of a specific study, or know if such a study was peer-reviewed, or how it related to the body of work in that field. No evidence was a presented to show that the use of actuarial devices enhances the accuracy of assessments for dangerousness.

Second, defendant argues Dr. Tierney's testimony was unpersuasive on the point of defendant's dangerousness because she "relied heavily on the sentiment that [his] thought processes were the same as when he committed the underlying offense, but the evidence suggested that [he] was otherwise free of behavioral issues and was compliant with medication." Disregarding defendant's testimony, and taking into account

15

defendant's criticisms of Dr. Tierney's presentation, and his medication compliance, in our view Dr. Tierney's testimony established that defendant is mentally ill, currently poses a substantial danger of physical harm to others as a result of that mental illness, has difficulty controlling his dangerous behavior, and would not take his medication if he were unmonitored. Defendant's statements to Dr. Tierney and in his Wellness and Forensic Relapse Prevention Plans about his committing offense, his plans upon release, his continuing delusions of grandeur, his letter to Mr. Forbes, and the two recent violent incidents in the dining hall, provided strong evidence the error in forcing defendant to testify was not prejudicial. Under these circumstances, we conclude it is not "reasonably probable that a result more favorable [to defendant] would have been reached" by the trier of fact if defendant had not testified. (*Watson, supra*, 46 Cal.2d at p. 836.)

### 2. Reliance by Dr. Tierney on Statements by Other Psychiatrists and Hospital Personnel As a Basis for Her Expert Opinion Did Not Violate the Confrontation Clause Under Current Law.

Defendant contends Dr. Tierney's reliance on the opinions expressed and reports authored by hospital personnel and other members of defendant's treatment team violated his statutory and constitutional rights to confrontation as defined in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). *Crawford* holds the Sixth Amendment right to confront and cross-examine witnesses is violated by the admission at trial of testimonial hearsay, unless the declarant is unavailable and defendant had an opportunity for cross-examination, regardless of the reliability of those hearsay statements. We accept, for the purposes of defendant's argument, the right to confrontation applies in NGI commitment procedures by virtue of section 1026.5, subdivision (b)(7). (See *People v. Wolozon* (1982) 138 Cal.App.3d 456, 462 [former § 1026.5, subd. (b)(5) [now subd. (b)(7)] and due process guarantee right to cross-examine in NGI recommitment proceedings]; but see *People v. Angulo* (2005)

16

129 Cal.App.4th 1349, 1367 [*Crawford* does not apply to civil commitment proceedings under the Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq.)].

However, the question remains whether the statements on which Dr. Tierney relied are "testimonial" under *Crawford*. Under existing law, they are not. (See *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 312, fn. 2 [medical reports created for treatment purposes not testimonial]; *People v. Rodriguez*, *supra*, 58 Cal.4th at pp. 634-635 [same; emergency room medical records]; *People v. Cage* (2007) 40 Cal.4th 965, 986-988 [same; statement to emergency room physician]. See also *Davis v. Washington* (2006) 547 U.S. 813.)

Furthermore, Evidence Code section 801, subdivision (b) allows expert witnesses to rely on otherwise inadmissible hearsay in forming their opinions, as long as the hearsay is "reliable." (See *People v. Gardeley*, *supra*, 14 Cal.4th at p. 618.) And, since out-of-court statements admitted as basis evidence are not admitted for their truth, but only to help evaluate the expert's opinion, some case law holds the confrontation clause is not applicable. (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209–1210.) Other cases disagree. (See *People v. Miller* (2014) 231 Cal.App.4th 1301.) "A majority of the justices of the United States and the California Supreme Courts have recognized that when an expert relies on hearsay basis evidence as true when forming an opinion and relates that basis evidence to the jury as true, the statements are admitted for their truth for purposes of the confrontation clause. (See *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221, 2256-2257] (conc. opn. of Thomas, J.); *id.* at p. 2272 (dis. opn. of Kagan, J.); *People v. Dungo* (2012) 55 Cal.4th 608, 627 (conc. opn. of Werdegar, J.); *id.* at p. 635, fn. 3, (dis. opn. of Corrigan, J.); see also *People v. Valadez* (2013) 220 Cal.App.4th 16, 31-32 [discussing various opinions in *Williams* and *Dungo* ].) This conclusion rests on the insight that the jury, in evaluating expert testimony, will almost always assume or determine the truth of this basis evidence. (See, e.g., *Williams,* at p. 2257 (conc. opn. of Thomas, J.) [' "To use the inadmissible information in evaluating

the expert's testimony, the jury must make a preliminary judgment about whether this information is true." ']; *Hill, supra,* 191 Cal.App.4th at pp. 1129-1131)." (*People v. Miller, supra,* at pp. 1311-1312.)

This may be about to change:  Our Supreme Court has granted review in two cases which raise the question whether the Sixth Amendment right to confrontation is violated by a gang expert's reliance on testimonial hearsay.  (See fn. 2, *ante*.)  Until then, and for the reasons stated in *People v. Hill*, *supra*, 191 Cal.App.4th at pages 1129-1130, we are bound by existing precedent.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  We therefore reject defendant's argument.

## DISPOSITION

The judgment is affirmed.


_____ _____
Dondero, J.


We concur:


_____
Humes, P.J.


_____
Margulies, J.

18