Filed 7/29/16  Keehn v. La Jolla Cosmetic Laser Clinic CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DANIEL KEEHN, | D068229 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2013-00062445-CU-PN-NC) |
| LA JOLLA COSMETIC LASER CLINIC et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas III, Judge.  Reversed and remanded with directions.

Doucette Law Group and Jodi L. Doucette for Plaintiff and Appellant.

Neil, Dymott, Frank, McFall, Trexler, McCabe & Hudson and Sheila S. Trexler, David P. Burke and Julie Ann Lowell for Defendants and Respondents.

Plaintiff and appellant Daniel Keehn sued defendants and respondents La Jolla Cosmetic Laser Clinic (Clinic), Jasmine McLeod, M.D., and Mahsid Mani for negligence, breach of contract, and "assault and battery," alleging he suffered permanent injuries to his face, neck and chest after undergoing laser treatment at Clinic.  The trial

court granted summary judgment in defendants' favor, ruling the one-year statute of limitations of Code of Civil Procedure[1] section 340.5 barred Keehn's medical negligence cause of action, and there was no admissible evidence supporting independent causes of action for breach of contract or battery. On appeal, Keehn contends the court erred by granting summary judgment because the limitations period for his medical negligence claim was equitably tolled based on evidence he did not know he was permanently injured or that malpractice had occurred but continued his treatment with defendants. He further contends defendants intentionally concealed their malpractice from him and allayed his concerns; and he pursued an alternative legal remedy for the harm that he had suffered, requiring defendants be equitably estopped from asserting the statute of limitations or equitably tolling the statute during that time. Keehn finally contends he raised triable issues of fact as to his battery and breach of contract causes of action.

We reverse the summary judgment. As for Keehn's medical negligence claim, the trial court erred by excluding Keehn's opposing expert declaration, and Keehn's evidence raises triable issues of material fact as to his discovery of defendants' alleged medical negligence, precluding summary judgment on statute of limitations grounds and also as to whether their care and treatment fell below the standard of care. However, even taking Keehn's summary judgment evidence as true, it is insufficient as a matter of law to establish viable claims for breach of contract and battery. Accordingly, we reverse the judgment with directions that the trial court enter a new order granting summary

---

[1]     Statutory references are to the Code of Civil Procedure unless otherwise specified.

adjudication as to those claims, and denying summary adjudication as to Keehn's negligence claim.

## FACTUAL AND PROCEDURAL BACKGROUND

We state the facts from the record before the trial court when it made its summary judgment ruling, viewing the evidence and resolving all inferences and doubts from it in Keehn's favor. (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

In May 2011, Keehn underwent Intense Pulse Light (IPL) laser treatment at Clinic on his neck and chest, performed by Mani, a registered nurse. Keehn returned to Clinic on August 15, 2011, for further treatment for redness on his chest and neck. On both occasions, Keehn signed consent forms.[2] During Dr. McLeod's administration of the laser on August 15, 2011, Keehn was in extreme pain and yelling, "ouch," "wait a minute," and "stop," and he asked Dr. McLeod to stop several times. The doctor hesitated momentarily but coaxed Keehn to continue; she assured him to "push through." According to Keehn, Dr. McLeod told him they always were more aggressive on the

---

[2]     Defendants' consent form for the August 15, 2011 IPL treatment, on which Keehn handwrote and initialed after each paragraph, states in part (with Keehn's handwriting in italics): I *Daniel Keehn*, understand that I will undergo (IPL) Intense Pulse Light Laser/Yag Laser for the treatment and/or correction of: *Redness*. [¶] I understand that the Lumenis One IPL is intense pulse light. The treatment is intended for Photorejuvenation in addition to treatment of benign vascular and pigmented lesions and that clinical results may vary in different skin types. . . . [¶] . . . [¶] "The most likely complications/risks: I understand that most people may experience a temporary redness similar to sunburn. You may feel sunburn like [*sic*] sensation for several hours after the treatment. Some swelling of the skin may occur. I also understand that there is a possibility of rare side effects such as scarring and permanent discoloration as well as short-term effects such as reddening, mild burning, temporary bruising and temporary discoloration of the skin. These effects have all been full [*sic*] explained to me."

3

second treatment and it was necessary to go "extra deep" to get anything that was precancerous. After the treatment, Keehn and his friend noticed large purple and brown spots on Keehn's chest that looked like his skin was blistering and beginning to scab. That night, Keehn's friend took several pictures of Keehn's skin.

Three days later, Dr. McLeod saw Keehn for the blisters that had formed after his August 15, 2011 IPL treatment. She recommended he use topical burn creams. Keehn returned to Clinic and saw Dr. McLeod again on August 19, 22 and 25, 2011, and on September 2 and 16, 2011, continuing his topical treatments. On August 20, 2011, Keehn saw a nurse at Clinic who told him not to wear clothing touching his chest and neck due to his open wounds. Keehn returned to Clinic four additional times for different (Fraxel) laser treatments in October and December 2011, and January and February 2012. Dr. McLeod saw Keehn the last time on June 7, 2012, at which time she noted he had areas of hypopigmentation on his neck and chest.

Keehn was not told at any of his follow-up visits and treatments at Clinic that anyone had performed improperly, made a mistake or had done something wrong, or that their treatment fell below the standard of care. After August 15, 2011, Keehn was continually told that further treatments would improve his skin from its original condition. He followed Dr. McLeod's and Mani's recommendations as he understood they were trained professionals in the area of practice and thus continued his treatments with Clinic. Keehn was not given Clinic's medical records for each of his visits, on which Dr. McLeod had recorded the fact that the treatment had caused second degree

4

burns to his skin.  Keehn saw those medical records for the first time through his attorney in the present action.

On June 7, 2012, defendants told Keehn he could continue to improve from a new type of machine—a V-Beam—that Clinic did not have at the time.  Keehn followed up with Clinic in August and October, but it still did not have the V-Beam.

Keehn saw his primary physician, Billy Green, M.D., on September 1, 2012.  She told him his condition was healing well but she was not a specialist in skin or dermatology, and she did not tell him that his treatment at Clinic was malpractice or fell below the standard of care.  On September 12, 2012, another doctor, Carol Hollan, M.D., asked for a copy of Keehn's medical records from Clinic.

On October 3, 2012, Keehn went to see Dr. Richard Fitzpatrick for V-Beam treatment.  Dr. Fitzpatrick told him then for the first time that respondents' care and treatment had fallen below the standard of care in the industry and that Keehn had suffered second degree burns.  Dr. Fitzpatrick's clinical progress note from that day as to his impression reads:  "(1) Hypopigmented scarring secondary to excessive energies used with IPL  [¶]  (2) Persistent photo damage of upper chest and neck."  Several days later, Dr. Fitzpatrick's associate, Dr. Mitchel Goldman, requested copies of Keehn's medical records from Clinic.  On October 26, 2012, Dr. Fitzpatrick wrote an addendum "Impression" note in Keehn's chart:  "While it would be acceptable to have a random spot of blistering, this degree of blistering and subsequent scarring would be considered below the standard of care."

5

On August 13, 2013, Keehn filed suit against defendants, alleging a single cause of action for professional medical negligence. Keehn eventually filed a first amended complaint alleging causes of action for negligence, breach of contract, professional negligence and "assault and battery." In support of his negligence cause of action, Keehn alleged in part that on August 15, 2011, defendants administered laser treatments on his neck, chest and shoulder region "at an energy setting . . . much too high and intense for these areas and for [his] skin," and afterwards they were negligent because they "did not appreciate the seriousness of [his] injuries, nor did not convey or properly disclose the seriousness of his condition . . . , and did not provide care, treatment or appropriate referrals to promptly address [his] worsening condition." In support of his professional negligence cause of action, Keehn similarly alleged defendants' professional negligence caused him serious injuries and "did not provide care, treatment or appropriate referrals to promptly address [his] condition."

Mani and Clinic, and separately Dr. McLeod and Clinic, moved for summary judgment or alternatively summary adjudication of issues. They argued Keehn had admitted during discovery that he discovered his injury on or before August 19, 2011, the date he sought remedial medical care from the defendants and also complained about his condition, barring his professional negligence and breach of contract causes of action under section 340.5's one-year statute of limitations. They argued that uncontradicted expert testimony—via Dr. McLeod's declaration submitted in connection with the motions—demonstrated that Keehn's treatment met the applicable standard of care and neither Mani nor Dr. McLeod negligently caused his injuries. Defendants further argued

6

that Keehn could not create a triable issue of fact as to whether a breach of contract occurred or medical battery was committed. They argued Keehn's contract claim was an impermissible splitting of his medical negligence cause of action, Keehn could not establish a contract existed, and there was no promise of a specific result or meeting of the minds to establish such a claim. As for Keehn's battery claim, they argued it also sounded in negligence and Keehn could not establish defendants committed battery in part by intending to cause him harm, or that he did not give informed consent.

Keehn opposed the motions, objecting to defendants' evidence on several grounds. He submitted his declaration recounting the fact that after his treatment on August 15, 2011, no one at Clinic told him he had suffered second degree burns, he did not see his medical records documenting that information, and he returned to Clinic for repeated follow-ups and received assurances from Dr. McLeod that his skin would heal well and improve from his follow-up care and visits. Keehn also submitted the declaration of Dr. Goldman, who averred that he had helped develop the IPL and specifically the Lumenis One Laser, and that Dr. Fitzpatrick, his associate, was a medical professional expert in the field of laser treatments who had been treating Keehn. Dr. Goldman stated that Dr. Fitzpatrick had passed away in the last year. Referring to Dr. Fitzpatrick's October 2012 note, which Dr. Goldman stated was a business record kept at their facility, Dr. Goldman reiterated that it was Dr. Fitzpatrick's opinion that defendants' care fell below the standard of care in their professional industry, and that Keehn had suffered second degree burns at their hands. Dr. Goldman also stated that after he had reviewed Keehn's medical files, he concurred that defendants' medical care fell below the acceptable standard of care in their

7

medical professional community, and that second degree burns and the resultant IPL treatment at Clinic was below the standard of acceptable medical care. According to Dr. Goldman, Clinic's treatment caused Keehn to suffer the second degree burns and appeared to make his skin condition considerably worse than when Keehn appeared at Clinic in May 2011.

In reply, defendants objected to Dr. Goldman's declaration on grounds it lacked foundation and was devoid of facts, misstated facts, was hearsay, called for speculation, was beyond the scope of his expertise, and was not offered to a reasonable degree of medical probability. In part, they challenged Dr. Goldman's declaration on grounds he did not state he had provided IPL laser treatments on patients or was familiar with health care providers' standard of care in such treatments. They argued his opinions concerning the standard of care and causation were mere conclusions without supporting facts or reasoned explanation.

Sustaining defendants' objections to Dr. Goldman's declaration, the trial court granted the motion. It ruled Keehn's action was essentially for medical negligence and was barred by the one-year statute of limitations. The court ruled additionally that on the merits, Dr. Goldman's declaration was insufficient to create a triable issue of fact regarding any violation of the standard of care. It overruled the remaining evidentiary

8

objections. The court finally ruled Keehn's remaining causes of action lacked support by admissible evidence.[3]

Keehn appeals from the ensuing judgment in defendants' favor.

DISCUSSION

I. *Standard of Review*

" 'A trial court properly grants a motion for summary judgment where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ' " (*Hampton v. County of San Diego*, *supra*, 62 Cal.4th at p. 347.) The moving parties, here defendants, bear an initial burden to show the cause of action has no merit, that is, to show " ' " 'the plaintiff "has not established, and cannot reasonably expect to establish," ' the elements of his or her cause of action." ' " (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) A defendant may also move for summary adjudication of an affirmative defense, which is properly granted when there is no triable issue of material fact as to the defense, and the motion completely disposes of that

---

3    The court's ruling states: "Though phrased in numerous and creative ways, the present action is essentially a medical negligence case and the one year statute of limitations applies. There is no admissible evidence to support an independent claim for battery (and [Keehn's] attempt to create such a claim actually strengthened the defense statute of limitations argument). There is no admissible evidence to support an independent claim for breach of contract. Were the Court to follow [Keehn's] logic, all medical malpractice cases which included forms for billing or informed consent would also create a companion breach of contract case. Finally, though the Court finds the action is barred by the statute of limitations, the motion is granted on the merits as Dr. Goldman's declaration, after objection, is insufficient to create a question of material fact regarding violation of the standard of care."

defense. (§ 437c, subd. (f)(1); *North Coast Women's Care Medical Group, Inc. v. Superior Court* (2008) 44 Cal.4th 1145, 1160.) Once the moving defendant makes such a showing, the plaintiff is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact as to that cause of action or defense. (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1154; *Aguilar*, at p. 850.)

" ' " ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." ' " (*Hampton v. County of San Diego*, *supra*, 62 Cal.4th at p. 347; *Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1452 [it is more accurate to say that on summary judgment, the court considers all evidence in papers except that to which objections have been made and *properly* sustained].) However, "when a defendant can establish his defense with the plaintiff's admission sufficient to pass the strict construction test imposed on the moving party, the credibility of the admissions are valued so highly that the contradicting affidavits may be disregarded as irrelevant, inadmissible or evasive . . . ." (*Gray v. Reeves* (1977) 76 Cal.App.3d 567, 573-574.) This is because " 'admissions against interest have a very high credibility value. This is especially true when . . . the admission is obtained not in the normal course of human activities and affairs but in the context of an established pretrial procedure whose purpose is to elicit facts.' " (*Ibid.*, quoting *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 22.)

10

II. *Bar of the Statute of Limitations*

A. *The Discovery Rule*

Section 340.5 sets forth the applicable statute of limitations for an action against a health care provider based upon such person's alleged professional negligence. Such an action must be brought within "three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." (§ 340.5.)[4] The one-year period may be extended by the required 90-day notice of intent to sue a health care provider. (§ 364, subd. (a).) If the notice of intent is served within 90 days of the expiration of the statute of limitations, the time for commencement of the action is extended by 90 days from the date of service. (§ 364, subd. (d).)

Section 340.5's discovery rule postpones accrual of a cause of action, and thus commencement of the statute of limitations, until the plaintiff discovers or has reason to discover the injury. (*Norgart v. Upjohn Company* (1999) 21 Cal.4th 383, 397; *Pooshs v. Philip Morris USA, Inc.* (2011) 51 Cal.4th 788, 797; *Gutierrez v. Mofid*, *supra*, 39 Cal.3d

---

[4]     Section 340.5 further provides: "In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person." These tolling provisions apply only to the outside three-year statute of limitations. (*Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 96, 100-101 (*Sanchez*) [addressing former section 340.5 but noting that the later amended statute makes this proposition clear].) "The 'one-year period is not similarly extended.' " (*Warren v. Schecter* (1997) 57 Cal.App.4th 1189, 1201, quoting *Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 896; *Kleefeld v. Superior Court* (1994) 25 Cal.App.4th 1680, 1685 ["[t]here is no tolling provision in the one-year limitation, not even for fraud or concealment, much less for the pursuit of evidence of negligence"].)

11

at p. 896.) "[T]he term 'injury,' as used in section 340.5, means both 'a person's physical condition *and* its "negligent cause." ' " (*Gutierrez*, at p. 896, quoting *Sanchez*, *supra*, 18 Cal.3d at p. 99; see *Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931 [discovery rule delays accrual until the plaintiff is " 'aware of her injury and its negligent cause' "]; *Brown v. Bleiberg* (1982) 32 Cal.3d 426, 433-435; *Gray v. Reeves*, *supra*, 76 Cal.App.3d at p. 575.) Accordingly, the statute of limitations does not commence merely because a patient is aware of the physical manifestation of injury. However, the patient is "charged with 'presumptive' knowledge of his negligent injury, and the statute commences to run, once he has ' "notice or information of circumstances to put a reasonable person *on inquiry,* or *has the opportunity to obtain knowledge* from sources open to his investigation . . . ." ' [Citation.] Thus, when the patient's 'reasonably founded suspicions [have been aroused],' and she has actually 'become alerted to the necessity for investigation and pursuit of her remedies,' the one-year period for suit begins." (*Gutierrez*, at pp. 896-897; see also *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807-808.)

Application of the statute of limitations, including the question of belated discovery, is usually a factual issue to be decided by a trier of fact. (*Fox v. Ethicon Endo-Surgery, Inc.*, *supra*, 35 Cal.4th at p. 810; *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.) But "where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." (*Jolly*, at p. 1112; see *Clark v. Baxter Healthcare Corp.* (2000) 83 Cal.App.4th 1048, 1054-1055; *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487.)

12

B.  *Contentions*

Keehn contends the court erred by ruling the statute of limitations barred his negligence cause of action.  He maintains the evidence shows he did not know he was permanently injured but was led to believe his condition was part of the process for getting the ultimate results of his IPL procedure, and thus he sought follow-up care with defendants.  He argues that even if he discovered that he had suffered permanent injuries, because he continued his treatment and defendants did not disclose the severity of his burns but rather allayed his concerns, any diligence in learning the negligent cause is diminished, and any suspicion of wrongdoing on his part was vitiated by defendants' actions.  He points out the evidence shows he sought out another professional, Dr. Fitzpatrick, only because he had a particular machine that would accomplish his ultimate result.  Keehn maintains defendants' intentional concealment of the second degree nature of his burns tolled the limitations period under section 340.5, subdivision (2).  Finally, Keehn argues defendants should be equitably estopped from asserting the statute of limitations, or the limitations period should be equitably tolled, based on his good faith pursuit of a legal remedy.

Defendants respond by asserting that the evidence shows Keehn "knew immediately after the August 15, 2011 IPL procedure he developed blisters and he suspected negligence on the part of Defendants," which commenced the one-year statute of limitations.  Specifically, they point to Keehn's response to special interrogatory No. 5, which asked him to "[s]tate the date you or anyone on your behalf became aware of the facts that the care provided by the defendant was negligent."  (Some capitalization

13

omitted.)  Keehn objected that it called for speculation as to other people's knowledge, but responded:  "[A]s to this answering Plaintiff, August 15, 2011, was when it was first discovered by Plaintiff, John Theriault, and Kitty Keehn, and its discovery is continuing to date.  Dr. Fitzpatrick and staff on October 3, 2012[,] and Dr. Cohen and staff on April 3, 2013[.]  Dr. Green was seen the day or so after the injury was incurred."  Defendants also point to the fact Keehn sought copies of his medical records from Clinic in September and October 2012.[5]  Defendants maintain this evidence shows Keehn "clearly admit[ted] . . . he suspected negligence on the part of Defendants on 'August 15, 2011.' "

C.  *Defendants' Evidence Does Not Establish Keehn Unequivocally Admitted to Knowledge or Suspicion of Defendants' Negligence in August 2011 and Keehn's Evidence Presents Triable Issues of Fact of His Knowledge or Suspicion*

Normally, we would first address whether, with the foregoing evidence of Keehn's discovery admissions, defendants met their initial summary judgment "burden of

---

5    Defendants additionally point to Keehn's assertion in his opposing summary judgment points and authorities that he "demanded" further care for his pain and damaged condition on August 19, 2011.  But statements in points and authorities are not admissible evidence.  (*Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 767, fn. 8; *Brehm Communities v. Superior Court* (2001) 88 Cal.App.4th 730, 735.)  In their summary judgment motions below, defendants referred to the following portion of Keehn's deposition testimony:  "[Defense counsel:]  You're telling me about your neck and chest several days after the treatment.  Do you recall what your neck and chest looked like on the 16th, the day after the treatment?  [¶]  [Keehn:]  Yes.  [¶]  [Defense counsel:]  What did it look like then?  [¶]  [Keehn:]  Where it had bruised, the skin had started turning black and was starting to peel back."  This testimony demonstrates that Keehn may have been aware of his injury, but not that it was caused by any wrongdoing.

14

production to make a prima facie showing of the nonexistence of any triable issue of material fact" as to commencement of the one-year limitations period. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at pp. 850-851; *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 334; *Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1443 [" ' "Despite the shifting burdens of production, the defendant, as the moving party, always bears the ultimate burden of persuasion as to whether summary judgment is warranted" ' "].) But Keehn has forfeited any argument that defendants did not meet their summary judgment burden because he does not advance such an argument here (nor did he below). (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1984-1085.)

Keehn instead contends his evidence raised triable issues of material fact precluding summary judgment on grounds of the statute of limitations. As we explain, we agree. We have summarized above that "it is not enough to commence the running of the limitations period when the plaintiff knows of her injury and its factual cause (or physical cause). Rather, the plaintiff must be aware of her injury, its factual cause, *and sufficient facts to put her on inquiry notice of a negligent cause*." (*Clark v. Baxter Healthcare Corp.*, *supra*, 83 Cal.App.4th at p. 1057, italics added.) While the discovery rule requires a suspicion " 'that someone has done something wrong' to him" (*Norgart v. Upjohn Co.*, *supra*, 21 Cal.4th at p. 397), a patient "is fully entitled to rely upon the physician's professional skill and judgment while under his care, and has little choice but to do so." (*Sanchez*, *supra*, 18 Cal.3d at p. 102; see also *Brown v. Bleiberg*, *supra*, 32 Cal.3d at p. 438, fn. 9; *Kitzig v. Nordquist* (2000) 81 Cal.App.4th 1384, 1393; *Unjian v. Berman* (1989) 208 Cal.App.3d 881, 886.) "Where . . . the injury is obvious but there is

nothing to connect that injury to defendant's negligence it cannot be said as a matter of law the plaintiff's failure to make an earlier discovery of fault was unreasonable. [Citation.]  This is especially true in cases . . . where the plaintiff continues under the doctor's care, doesn't inquire about the cause of his apparent injury and is given an explanation calculated to allay any suspicion of negligence on the doctor's part."  (*Unjian*, at p. 885; see also *Brown v. Bleiberg*, at p. 434 [reversing summary judgment because "reasonable minds could differ" about the sufficiency of the plaintiff's explanation that she was prevented from suspecting negligence by her doctor's misrepresentations about the nature of the surgery he performed and why he performed it].)

Here, Keehn's summary judgment declaration demonstrates that after his August 15, 2011 treatment, though he observed his skin was blistering, he did not seek out a second opinion right away but remained under Dr. McLeod's care, seeing her consistently until June 7, 2012.  According to Keehn, during this time, defendants never suggested anything was wrong and they encouraged him to continue treatment with them; that his "condition would heal well and improve with the follow-up care and visits."  Even after his last treatment with Dr. McLeod, Keehn followed up with Clinic in August and October to check if Clinic had obtained the V-Beam that defendants had recommended would help Keehn "improve."  Keehn was never advised he had suffered second degree burns or that his symptoms were caused by negligence until Keehn saw Dr. Fitzpatrick in October 2012.  Keehn only went to Dr. Fitzpatrick because Clinic had not yet obtained the machine recommended by defendants, and it was at that time, within one year from Keehn's August 2013 filing of his initial complaint (and well within three years from the

16

date of the negligent treatment), that Dr. Fitzpatrick told Keehn that Clinic's treatment had caused him second degree burns and fell below the industry standard of care.

Keehn's awareness on August 15 2011, and afterwards that he developed blisters or that his treatment hurt more than expected is insufficient by itself to trigger the statute of limitations: "The fact an operation did not produce the expected result would not necessarily suggest to the ordinary person the operation had been performed negligently." (*Unjian v. Berman*, *supra*, 208 Cal.App.3d at p. 885.) Our Supreme Court has explained that "[t]he best medical treatment sometimes fails, or requires long and difficult recuperation, or produces bad side effects. Thus, even if a patient is unhappy with his condition, he may not suspect he has been wronged. Lacking medical knowledge, he may reasonably rely upon his negligent physician's soothing disclaimers." (*Gutierrez v. Mofid*, *supra*, 39 Cal.3d at p. 899.) Additionally, contrary to defendants' argument, evidence that Keehn had his last treatment at Clinic in June 2011 does not also establish or even suggest that he had discovered defendants' negligence by that time, particularly where the evidence shows his willingness to return to Clinic; checking back with it in August and October for the machine Dr. McLeod had recommended for him. Likewise, Keehn's claim is not defeated by evidence that he saw his primary care physician Dr. Green (who told him he was "healing well" in any event) and that other physicians sought copies of Keehn's medical records from Clinic. His visit and these requests occurred in September and October 2012 within one year from the August 2013 filing of his lawsuit, and thus even assuming they constitute proof that Keehn suspected negligence on

17

defendants' part (an inference favoring defendants that we cannot draw in a summary judgment analysis), they do not render his complaint untimely.

Keehn's interrogatory response does not compel a different result.  It is true that in the summary judgment context, admissions or concessions made during the course of discovery govern and control over contrary and self-serving declarations by a party submitted on a motion for summary judgment.  (See *Shin v. Ahn* (2007) 42 Cal.4th 482, 400, fn. 12; *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 861; *D'Amico v. Board of Medical Examiners*, *supra*, 11 Cal.3d at pp. 21-22; *Visueta v. General Motors Corp.* (1991) 234 Cal.App.3d 1609, 1613; *Gray v. Reeves*, *supra*, 76 Cal.App.3d at pp. 573-574.)  But " 'summary judgment should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence.' "  (*Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 460, quoting *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 482, overruled on other grounds by *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1182; *Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1523 [citing cases].)  Properly applied, the rule stated in *D'Amico* and these cases permits a court to disregard a party's declaration testimony *only* where the declaration and the discovery responses are "contradictory and mutually exclusive" (*Benavidez*, at pp. 862-863) or "diametrically opposed" (*Gray v. Reeves*, at p. 574), or where the declaration contradicts "unequivocal admissions" in discovery.  (*Mikialian v. City of Los Angeles* (1978) 79 Cal.App.3d 150, 162.)

Contrary to defendants' assertion, Keehn did not straightforwardly admit in discovery that he suspected negligence or wrongdoing by defendants on August 15, 2011. Defendants' special interrogatory—asking Keehn for the date he became aware of "*facts* that the care provided by . . . defendant[s] was negligent" (some capitalization omitted)— is not such an unambiguous or unequivocal question. Strictly construing it as we must, we read the inartful question as calling for the date that Keehn obtained knowledge of facts *supporting or underlying* his claim of negligence, not when he in fact discovered or suspected defendants were negligent in their care and treatment. At best, Keehn's response—that he discovered "it" on August 15, 2011—is a tacit or equivocal admission that will not permit application of the *D'Amico* rule where there is credible contradictory evidence. (*Minish v. Hanuman Fellowship*, *supra*, 214 Cal.App.4th at p. 460.) Keehn's summary judgment declaration recounts his continued visits and defendants' reassurances that his continued treatment with them would improve his condition. There is nothing implausible about his explanation. Particularly where he had been previously informed in writing that the IPL treatment could result in temporary burning, bruising, and discoloration, there is no indication Keehn knew or should have known on August 15, 2011, that anything incorrect had been done, or that he had been harmed through professional negligence from his IPL treatment at Clinic. On a summary judgment, this is a case where "reasonable minds could differ" (*Brown v. Bleiberg*, *supra*, 32 Cal.3d at p. 434) as to the sufficiency of Keehn's explanation that he was prevented from suspecting defendants' negligence.

19

In sum, accepting Keehn's declaration and on the record as a whole, the evidence presents a triable issue of fact as to whether Keehn discovered, or reasonably should have discovered, that defendants' negligence caused his injury for purposes of triggering the one-year statute of limitations on August 15, 2011. Our conclusion renders it unnecessary to address Keehn's theories as to intentional concealment, equitable tolling and estoppel.

### III. *Professional Negligence Causes of Action*

We further hold that the evidence raises fact issues for a jury as to whether defendants' care and treatment fell below the standard of care.[6] Keehn sought to meet his opposing summary judgment burden by proffering Dr. Goldman's opinion, but the trial court excluded his declaration in its entirety as "insufficient to create a question of material fact regarding violation of the standard of care." In reviewing the propriety of summary judgment, we consider "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We review for abuse of discretion the trial court's decision to exclude Dr. Goldman's testimony. (*Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 505; *Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467; *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679.)

---

6    Our conclusions apply to both Keehn's negligence and professional negligence causes of action, the underlying allegations of which appear to be indistinguishable.

20

A. *The Court Erred by Excluding Dr. Goldman's Declaration*

Principles relating to the admissibility and foundation of expert testimony are well established:  "[S]ection 720 provides that a person may testify as an expert 'if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates,' and that '[a] witness'[s] special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony.' "  (*People v. Jones* (2012) 54 Cal.4th 1, 57.)

"[T]he lack of foundation of an expert's testimony can be as to the expert being qualified, the validity of the principles or techniques upon which the expert relied, or as to the reliability and relevance of the facts upon which the expert relied."  (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1114.)  Against a party's objections, special knowledge, experience, training or education must be shown before the witness may provide expert testimony, and his qualifications must be related to the particular subject upon which he is giving testimony.  (*Id*. at p. 1115.)  "However, 'work in a particular field is not an absolute prerequisite to qualification as an expert in that field.' [Citation.]  For example, '[q]ualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion.' "  (*Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1319; see *Brown v. Colm* (1974) 11 Cal.3d 639, 645 ["The unmistakable general trend in recent years has been toward liberalizing the rules relating to the testimonial qualifications of medical experts"]; *Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 37 [same].)  "The determinative factor is whether the expert 'has sufficient

skill or experience in the field so that his [or her] testimony would be likely to assist the jury in the search for the truth.' " (*Chavez*, at p. 1319, quoting *Mann*, at p. 38.) Once an expert establishes knowledge sufficient to permit his or her opinion to be considered by a jury, concerns about the extent of an expert's expertise or the matter used to formulate his opinion go to the weight of his testimony, not its admissibility. (See *People v. Jones*, *supra*, 54 Cal.4th at p. 59; *People v. Bolin* (1998) 18 Cal.4th 297, 322; *Chavez*, at p. 1319 ["degree of expertise goes to the weight of the expert's testimony, not its admissibility"]; *Howard Entertainment*, at p. 1121 ["So long as foundational reliability is met, the strength of an expert's assumptions affects the weight rather than the admissibility of the opinion"].)

Because the trial court did not state its specific reasons for excluding Dr. Goldman's opinion, we address each of defendants' objections to determine whether any of them warranted exclusion.

1. *Qualifications/Foundation*

Defendants objected to Dr. Goldman's declaration on grounds it lacked foundation, "he show[ed] no evidence of being qualified to offer an expert opinion in the matter," and his opinions were "beyond the scope of [his] expertise." On appeal, defendants argue Dr. Goldman "failed to state he performed IPL procedures or he was familiar with the standard of care regarding IPL treatment of patients with rosacea; . . . he did not cite what specific medical records he reviewed and failed to provide any medical records to the court . . . ."

22

The court abused its discretion to the extent it determined Dr. Goldman lacked foundation, qualifications, or expertise for his opinions. Dr. Goldman stated he is a medical doctor and owner of Goldman Butterwick Groff & Fabi, a Cosmetic Laser Dermatology center, which provides laser cosmetic services to patients. Dr. Goldman averred that he helped develop the IPL laser and particularly the Lumenis One Laser., the very same laser used in Keehn's treatment. His lengthy curriculum vitae (CV), which he referred to as an exhibit and is in the record, reflects that he went to Stanford Medical School, was a dermatology resident at UCLA, and is board certified in dermatology and cosmetic surgery. He has served on numerous advisory boards and is a medical consultant for several companies. The CV reflects that from the mid-1990's to the present time, Dr. Goldman has served as a manuscript reviewer for journals including the Journal of the American Academy of Dermatology, Lasers in Surgery and Medicine, and the International Journal of Cosmetic Surgery, among many others. He has been the principal investigator for numerous clinical studies, several relating to the efficacy of the Lumenis One IPL and other IPL usages, including for subjects with moderate to severe facial hyperpigmentation. The portion of Dr. Goldman's CV listing his medical textbooks, book chapters and other publications spans approximately 40 pages. Our review reveals that many of his writings involve varying usages of IPL and other lasers.[7]

---

[7] For example, Dr. Goldman is an author on publications entitled: "On the Horizon: Cosmetic Treatments with Lasers and Intense Pulsed Light"; "Treatment of Melasma and the Use of Intense Pulsed Light: A Review"; "The application of intense pulsed light in the treatment of dermatologic disease: a systemic review" and "Comparison of Intense Pulsed Light with 1,927-nm Fractionated Thulium Fiber Laser for the rejuvenation of the

23

Our assessment of the adequacy of Keehn's opposing summary judgment evidence requires us to liberally construe Dr. Goldman's declaration. (*Aguilar*, *supra*, 25 Cal.4th at pp. 844-845.) An opposing party's declaration does not need to be detailed, and it is entitled to all favorable inferences. (*Hanson v. Grode* (1999) 76 Cal.App.4th 601, 607; *Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1332; *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 125.) Giving Dr. Goldman's declaration such liberal construction as we must, we are left with little doubt that Dr. Goldman has sufficient skill and experience in the cosmetic and other use of IPL laser treatment on patients so that his testimony would be likely to assist the jury in the search for truth. (*Howard Entertainment, Inc. v. Kudrow*, *supra*, 208 Cal.App.4th at pp. 1114-1115.) "The test for determining familiarity with the standard of care is knowledge of similar conditions." (*Avivi v. Centro Medico Urgente Medical Center*, *supra*, 159 Cal.App.4th at p. 470.) Defendants' attack on Dr. Goldman's declaration for not specifically stating he was familiar with the standard of care regarding IPL treatment for rosacea, when the record reflects his expertise in a variety of laser and IPL usages for subjects with skin pigmentation issues, is unavailing and would require us to improperly strictly construe this evidence. Likewise unavailing is defendants' challenge to admissibility of Dr. Goldman's CV because Dr. Goldman did not state it is accurate, and it is not "signed under penalty of perjury." Defendants provide no authority for this

chest." Melasma is a "patchy pigmentation of sun-exposed skin . . . ." (Stedman's Medical Dictionary (28th ed. 2006) p. 1176, col. 1.)

proposition, and it is meritless, as Dr. Goldman signed his declaration, which refers to his CV as an attached exhibit, under penalty of perjury.

Citing *Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, defendants assert that a medical expert relying on medical records must put those records before the court or it will be deemed without evidentiary foundation. However, Dr. Goldman explained his opinion by referencing Keehn's medical records from Clinic, which were already authenticated and placed before the court by defendants—who had the initial burden of production on summary judgment (§ 437c, subd. (p)(2); accord, *Shugart v. Regents of University of California*, *supra*, 199 Cal.App.4th at p. 506), and those records, as well as Dr. Fitzpatrick's October 2012 records, were also attached to Keehn's opposing notice of lodgment. The circumstances are entirely unlike *Garibay*, in which the appellate court found the moving summary judgment defendant's medical expert had not demonstrated personal knowledge of the underlying facts on which he based his opinion because his declaration "attempted to testify to facts derived from medical and hospital records which were not properly before the court." (*Garibay*, 161 Cal.App.4th at p. 743.) *Garibay* does not require a party opposing summary judgment to file duplicate copies of the medical records on which the opposing expert relied in forming a disputed expert opinion if they are already before the court in support of the motion. (*Shugart*, at p. 506.)

The record permits an inference of the requisite knowledge to establish Dr. Goldman's qualifications, foundation and expertise to testify as an expert, and consequently the trial court abused its discretion in sustaining defendants' objections on these grounds.

25

2. *Specificity of and Support for Standard of Care and Causation Opinions*

Defendants further objected to Dr. Goldman's declaration on grounds it had "no evidence to substantiate" his conclusions, was "conclusory," called for speculation, and either misstated or was "devoid" of facts. On appeal, defendants further assert, citing *Powell v. Kleinman*, *supra*, 151 Cal.App.4th 112 and *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, that an expert's opinion given without a reasoned explanation has no evidentiary value, and that a medical expert's opinion must be stated to a degree of medical probability, none of which occurred here. The latter rule, that an opinion must be stated to a degree of medical probability, pertains only to causation. (*Jennings*, at p. 1118 [in a personal injury action causation must be proven within a reasonable medical probability based on competent expert testimony]; see also *Chakalis v. Elevator Solutions, Inc.* (2012) 205 Cal.App.4th 1557, 1572; *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 509.)

Defendants' challenges on these grounds are unavailing. In his declaration, Dr. Goldman stated he had reviewed Keehn's medical records, and, referring to Dr. Fitzpatrick's October 2012 note that Keehn had suffered second degree burns at the hands of defendants, he averred that after his independent review of the records, he agreed that defendants' "medical care fell below the acceptable standard of care in our medical professional community and that second degree burns from the treatment Daniel Keehn had on August 15, 2011, and the resultant IPL treatment at [Clinic] is below the standard of acceptable medical care." Importantly, the court in *Powell* distinguished between medical expert declarations submitted in support of and in opposition to the motion,

26

clarifying that an opposing declaration, such as Dr. Goldman's, "did not have to be detailed" and "must be liberally construed." (*Powell v. Kleinman*, *supra*, 151 Cal.App.4th at pp. 125, 128; see also *Jennifer C. v. Los Angeles Unified School Dist.*, *supra*, 168 Cal.App.4th at p. 1332 ["The requisite of a detailed, reasoned explanation for expert opinions applies to 'expert declarations in *support* of summary judgment,' not to expert declarations in *opposition* to summary judgment"].) Thus, the *Powell* court pointed out that a plaintiff's medical expert's declaration as to causation was sufficient where it stated the plaintiff " 'suffered nerve damage during the surgery and that the care defendants provided was a cause of his injuries.' " (*Powell*, at p. 125.) The reasonable inferences from that declaration " 'include a reading of the declaration to state that the nerve damage [the plaintiff] suffered during surgery was caused by the conduct of [the] defendants, which conduct fell below the applicable standard of care. Nothing more was needed.' " (*Ibid*., quoting *Hanson v. Grode*, *supra*, 76 Cal.App.4th at pp. 607-608.) We infer Dr. Goldman's opinion is based in part on records showing that Clinic's treatment resulted in second degree burns and scarring "secondary to excessive energies used with IPL," which informed his conclusion that the treatment fell below the requisite standard of care. His statements as to duty, while not a model of specificity, are sufficiently detailed to permit their admission. Likewise, Dr. Goldman's statement as to causation— that "[t]he treatment by [Clinic] caused Daniel Keehn to suffer second-degree burns and appeared to make [his] skin condition considerably worse than that which he had prior to presenting at [Clinic] in May 2011"—is sufficient. It does not just posit a " ' "mere possibility" ' " (*Jennings v. Palomar Pomerado Health Systems, Inc.*, *supra*, 114

27

Cal.App.4th at p. 1118) that defendants' treatments caused Keehn to suffer second degree burns and an adverse appearance.

Defendants challenge Dr. Goldman's reliance on the "partial unsigned addendum medical notation attributed to Dr. Fitzpatrick" on grounds the notation does not say that Dr. Fitzpatrick was familiar with the standard of care in the industry, it was dated 23 days after Dr. Fitzpatrick saw Keehn, it was not sworn under oath, and it is inadmissible hearsay. They point out Keehn did not designate Dr. Fitzpatrick as an expert. They argue the note cannot be used as expert opinion evidence. Defendants do not cite to any case authority in support of these specific assertions (as opposed to general principles) or accompany any of them with any meaningful legal argument, which entitles us to disregard them. (*Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059, 1081; *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2.) We are unpersuaded in any event, as Dr. Goldman averred that he independently reviewed Keehn's medical records and reached his own opinion in the matter. It is settled that an expert may rely upon reliable hearsay and other inadmissible matter, including medical and hospital records, in forming an opinion as long as the matter relied upon provides a reasonable basis for the opinion and the expert does not place opinions of nontestifying, out-of-court doctors before the jury. (*Howard Entertainment, Inc. v. Kudrow*, *supra*, 208 Cal.App.4th at p. 1115; see Evid. Code, § 801, subd. (b) [an expert's opinion may be based on matters known to the

expert "whether or not admissible"]; *Whitfield v. Roth* (1974) 10 Cal.3d 874, 895; *People v. Campos* (1995) 32 Cal.App.4th 304, 307-308.)[8]

B.  *Dr. Goldman's Declaration Raises a Triable Issue of Material Fact as to Whether Defendants' Treatment Fell Below the Standard of Care*

Keehn, in opposing defendants' motion for summary judgment, need only make a prima facie showing of the existence of a triable issue of material fact.  (*Jennifer C. v. Los Angeles Unified School Dist.*, *supra*, 168 Cal.App.4th at p. 1334.)  " 'Counter-affidavits and declarations need not prove the opposition's case; they suffice if they disclose the existence of a triable issue.' "  (*Id*. at p. 1333, citing *AARTS Productions, Inc. v. Crocker National Bank* (1992) 179 Cal.App.3d 1061, 1065.)

Here, Dr. Goldman's declaration, which contradicted the opinions of Dr. McLeod in her summary judgment declaration, suffices to meet Keehn's opposing summary

---

[8]     We reject any suggestion that Dr. Goldman's declaration suffers from the same failings as the expert trial testimony in *Whitfield v. Roth*, *supra*, 10 Cal.3d 874, involving a plaintiff's lawsuit against radiologists for negligently failing to detect a brain tumor when they examined her X-rays.  The defendants presented at trial one expert who testified over objection that he showed the X-rays to four neurological and radiological experts, and none of them detected any abnormality.  (*Id*. at pp. 893-894.)  Another defense expert testified he presented the plaintiff's X-rays to about 50 medical students, resident staff, and faculty doctors, and no one felt the X-ray demonstrated any significant pathology.  (*Id*. at p. 894.)  Admission of this testimony was held to be error because the out-of-court opinions were offered "solely for the improper hearsay purpose, namely as 'independent proof of the facts.' "  (*Id*. at pp. 895-896.)  Further, *Whitfield* (as well as *People v. Campos*, *supra*, 32 Cal.App.4th 304) is concerned with preventing the introduction of multiple opinions insulated from cross-examination into evidence, and the reasoning is confined to that situation.  (*People v. Miller* (2014) 231 Cal.App.4th 1301, 1313, fn. 8.)  Even if Dr. Goldman violated this principle by revealing the content of Dr. Fitzpatrick's opinion, his declaration makes clear he undertook his own evaluation of Keehn's medical records and reached his own opinion on the matter using Dr. Fitzpatrick's report if anything for corroboration, taking it outside the *Whitfield* context.

29

judgment burden. Indulging all reasonable inferences in support of his statements, it raises a triable issue as to whether defendants' IPL treatment of Keehn, which caused him second degree burns and a worse appearance to his skin than before he saw them, breached the standard of care in the industry. That was enough to defeat summary judgment. (See *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 856 ["if the court concludes that the plaintiff's evidence or inferences raise a triable issue of material fact, it must conclude its consideration and deny the defendants' motion"].)

## IV. *Breach of Contract Cause of Action*

Keehn's breach of contract cause of action is based on his allegations that defendants entered into an oral and written contract with him, by which they "agreed to provide designated laser services for a fee" and "promis[ed] such services would reduce, improve, and minimize his skin conditions and treat pre-cancerous conditions . . . ." He alleges the agreement "promised services that would not cause second degree burns or scarring to the nature that [he] suffered." Keehn alleges defendants breached the contract by failing to treat his skin condition and worsening the conditions to be addressed, including by magnifying the discoloration of his rosacea. On appeal, Keehn characterizes defendants' conduct as making "specific promises . . . in approving the recommendations for his care on May 5, 2011" including promises that "the treatment he would receive would be for his particular skin type and condition, and that it would specifically treat his

30

redness, even-out his skin tone, and treat his wrinkles, pre-cancerous condition, and rosacea."[9]

It has been held that in medical malpractice cases, "a doctor may be held liable on a theory of breach of contract where he has clearly and unequivocally warranted that a course of treatment recommended by him will, inevitably, produce a certain result." (*Pulvers v. Kaiser Foundation Health Plan, Inc.* (1979) 99 Cal.App.3d 560, 564-565; accord, *McKinney v. Nash* (1981) 120 Cal.App.3d 428, 442 ["To recover for breach of warranty or contract in a medical malpractice case, there must be proof of an express contract by which the physician clearly promises a particular result and the patient consents to treatment in reliance on that promise"]; *Depenbrok v. Kaiser Foundation Health Plan, Inc.* (1978) 79 Cal.App.3d 167, 171 [where "a surgeon has clearly promised

---

[9] The consultation form that Keehn references does not include such representations. Under "Recommendations," it merely contains handwritten notations for "IPL neck," "IPL chest" and "Fraxel face + eyes," indicating the costs. Mani checked a box on the form indicating she explained the "Risks/Benefits of Medications/Procedure/With verbal consent." At her deposition, Mani testified she "talked to [Keehn] about IPL. IPL is good for Rosacea and also it's good for brown spot [*sic*]. And Fraxel is a very good treatment for wrinkles and brown spot [*sic*]." She testified she talked to him "about IPL for the neck and chest." When Mani was asked, "What was the IPL supposed to treat for the neck and chest?" she responded, "It get rid of the redness and also it can get rid of the brown spot [*sic*]." When Mani was asked what her recommendation concerning Fraxel meant, she answered, "It makes the skin tighter and it gets rid of the hyperpigmentation," and "makes your pores smaller." She agreed it was her standard procedure to explain that Fraxel "could also assist in removing the precancerous condition that someone might have." Mani admitted that she circled the wrong number for Keehn's skin type; that he was a skin type III, but she circled type V, indicating dark skin. None of this testimony, even liberally construed, demonstrates that Mani clearly or unequivocally promised Keehn a specific outcome or result from the IPL treatments, and Keehn does not allege that the Fraxel treatments caused his injuries. Summary judgment cannot be denied on grounds not raised by the pleadings. (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1663.)

31

a particular result (as distinguished from a mere generalized statement that the result will be good), and . . . the patient consented to an operation or other procedure in reliance on that promise, there can be recovery on the theory of . . . breach of contract," fn. omitted]; *Crawford v. Duncan* (1923) 61 Cal.App. 647; see also *Brown v. Bleiberg*, *supra*, 32 Cal.3d at p. 431, fn. 1 [generally acknowledging cause of action, and observing it would be governed by limitations period for personal injuries].)

Here, defendants presented evidence via Keehn's deposition that on August 15, 2011, Dr. McLeod only told him she would be performing the laser treatments on him that day. Dr. McLeod's supporting summary judgment declaration states: "I never promised Mr. Keehn a specific result from the IPL laser treatment of August 15, 2011 and I did not guarantee him that he would not develop blisters from the treatment." She averred that she "never promised how much discomfort [he] would have during the procedure" and "never intended to enter into an oral or written contract with Mr. Keehn regarding how the IPL laser treatment would be provided or what specific results could be expected."

Keehn's opposing summary judgment declaration does not contradict this evidence. He states that he first consulted with Clinic on May 5, 2011, and he and his mother met with *Mani*, who presented as a doctor, diagnosed his skin condition, and gave him a written treatment plan. Keehn averred that Mani "orally promised that [Clinic's] services would improve [his] skin condition with such recommended services" and "this was the proper treatment recommendation for [his] skin type and conditions, specifically to treat my redness, even-out my skin tone, wrinkles, and rosacea." She also told him

32

that with the recommended IPL services, "[he] would feel slight pulses, slight redness like a light sunburn, and possible discomfort for which the medication would address." On appeal, Keehn points to Mani's treatment recommendations as well as Dr. McLeod's deposition in which she testified she agreed with Mani's May 5, 2011 recommendation to treat Keehn's skin condition with Fraxel and IPL treatments. He also points to Mani's deposition testimony that she determined her recommendation "would be the best to treat his condition at that time . . . ." Keehn claims that Mani's deposition admission that she mistakenly wrote down Keehn's skin type itself constitutes a breach of a contract that Clinic would provide the "best services."

Accepting the truth of Keehn's evidence on this point, and further assuming the evidence establishes both that Dr. McLeod adopted Mani's oral statements and that Mani's May 5, 2011 statements encompassed all of Clinic's services to Keehn including his August 15, 2011 treatment, we disagree with Keehn that the evidence is sufficient to demonstrate a *clear and unequivocal* promise of a certain or particular result. (*Pulvers v. Kaiser Foundation Health Plan, Inc.*, *supra*, 99 Cal.App.3d at pp. 564-565; *McKinney v. Nash*, *supra*, 120 Cal.App.3d at p. 442.) Mani's statements that the treatments would "improve [Keehn's] skin condition" or were the "best to treat his condition" are too generalized, vague and uncertain to give rise to an enforceable agreement. They are akin to a statement that his result will be "good," which is insufficient. (*Depenbrok v. Kaiser Foundation Health Plan, Inc.*, *supra*, 79 Cal.App.3d at p. 171; *Kershaw v. Tilbury* (1932) 214 Cal. 679, 685, 689 [action alleging physician represented that radio treatment would cure child's leg pain without an operation was an action sounding in tort, not contract];

33

*McKinney v. Nash*, at p. 442 [doctor's comment that hernia operation would be "simple and without problem" does not satisfy the standard of particularity for an express contract]; compare, *Crawford v. Duncan*, *supra*, 61 Cal.App. at p. 649 [plaintiff alleged she had consented to radium treatments in reliance on the doctor's statement "that no permanent scar of any kind would result from the treatment," which proved to be false].) Mani's other statement concerning what Keehn would experience *during* the treatments did not promise anything about their outcome or result.

Keehn's evidence does not establish or suggest that either Mani or Dr. McLeod promised that the IPL treatment would not cause second degree burns, and we will not imply any such agreement where an express agreement is required. (Accord, *McKinney v. Nash*, *supra*, 120 Cal.App.3d at p. 442 ["Plaintiff cannot *imply* a contract from Dr. Moon's failure to explain anything at all about the spinal anesthetic since the law requires an *express* contract"].) The evidence may demonstrate a failure to obtain Keehn's informed consent to treatment, but Keehn has not alleged such a cause of action, which as we explain below sounds in negligence in any event. (See *Cobbs v. Grant* (1972) 8 Cal.3d 229, 239; *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 324.)

"If a trial court erroneously grants summary judgment when a factual dispute exists but affects fewer than all causes of action, the appellate court may direct the trial court to enter an order granting summary adjudication of the unaffected causes of action if the moving party alternatively moved for summary adjudication." (*People ex rel. Government Employees Insurance Company v. Cruz* (2016) 244 Cal.App.4th 1184,

34

1197.)  Defendants did so here, and so we will direct the trial court to enter an order granting summary adjudication of Keehn's breach of contract cause of action.

## V. *Medical Battery Cause of Action*

Keehn contends he raised a factual dispute concerning whether Dr. McLeod committed a battery on him on August 15, 2011, by evidence that she continued the laser treatment after he cried out in pain and asked her to stop.  According to Keehn, Dr. McLeod's acts constituted an unconsented and offensive touching, meeting the legal standard for a battery.  Keehn concedes that lack of consent is an essential element of medical battery and that he consented to the IPL procedure.  However, he maintains the consent form did not include, and he therefore did not consent to, extreme pain, burning, scarring, permanent discoloration, or second degree burns, which he asserts "exceed[ed] the terms and conditions of the consent . . . ."

The California Supreme Court has explained that in the medical context, a battery occurs where "a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained."  (*Cobbs v. Grant*, *supra*, 8 Cal.3d 229, 239; see also *id*. at p. 240 ["The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented"].)  "When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present."  (*Id*. at p. 240.)  In contrast, "when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation

35

from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information.  In that situation the action should be pleaded in negligence."  (*Id*. at pp. 240-241; see also *So v. Shin* (2013) 212 Cal.App.4th 652, 669; *Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1495.)

Thus, for example, in *Kaplan v. Mamelak* (2008) 162 Cal.App.4th 637, on which Keehn relies, the appellate court reversed an order sustaining a demurrer to the plaintiff's battery cause of action based on his physician performing back surgery on the wrong disks.  (*Id*. at pp. 639-640, 645.)  The plaintiff's consent form had given the doctor permission to operate only on disk T8-9; the Court of Appeal observed the respondent "may have committed battery by operating on appellant's T6-7 and T7-8 disks when he did not have permission to operate on any disk other than T8-9."  (*Id*. at p. 646.)  It held that the matter of whether the surgery was a "substantially different procedure" was a factual question not capable of resolution by demurrer.  (*Id*. at p. 647.)  Likewise, in *Ashcraft v. King* (1991) 228 Cal.App.3d 604, also relied upon by Keehn, where the plaintiff consented only to a blood transfusion from family members but was given blood from nonfamily donors, the Court of Appeal reversed a nonsuit on his battery cause of action, holding the plaintiff presented sufficient evidence of battery to have the claim determined by a jury.  (*Id*. at pp. 610-613.)[10]

---

10    On the other hand, in *Piedra v. Dugan*, *supra*, 123 Cal.App.4th 1483, a nonsuit was properly granted where the evidence showed a plaintiff's parents had conditioned their consent for the defendant to administer medication on their knowledge of all the medications, but no evidence they had communicated that consent to the defendant physician.  (*Id*. at pp. 1497-1498.)  The court held that in the absence of defendant's

Here, no such factual question appears, but as a matter of law, Keehn's claim is one for negligence. As reflected by the August 15, 2011 consent form presented in support of defendants' motion (see footnote 2, *ante*), Keehn unconditionally consented to undergo the IPL procedure. The record simply does not support Keehn's assertion that "the consent form did not encompass the treatment [he] actually received." Nor does the record support his claim that he did not sign a consent form that included a different procedure—Fraxel—on the same day as the IPL. Defendants in fact submitted a consent form dated August 15, 2011 and signed by Keehn for Keehn's Fraxel treatment. Evidence that in connection with the IPL treatment Keehn suffered extreme pain, blistering, second degree burns, scarring, and skin discoloration—some of which were disclosed side effects and others "undisclosed inherent complication[s] with a low probability" (*Cobbs v. Grant*, *supra*, 8 Cal.3d at p. 240)—establishes his claim is not one for battery. (Accord, *Conte v. Girard Orthopaedic Surgeons Medical Group, Inc.* (2003) 107 Cal.App.4th 1260, [plaintiff's theory that he consented to only shoulder surgery with repair, not surgery without repair, did not permit either an action for battery or conditional battery].)

In reply, Keehn maintains that the mere fact he asked Dr. McLeod to stop the treatment and she did not is a battery "apart from . . . lack of consent." He also claims that the law is "divided" on the issue, and that his evidence demonstrates a valid cause of action for battery under the reasoning of *Rains v. Superior Court* (1984) 150 Cal.App.3d

actual knowledge of the condition, there was no evidence of an intentional violation of the scope of consent necessary for a medical battery, an intentional tort. (*Id*. at pp. 1498-1499.)

933, on the theory that defendants misrepresented the "down side" of what he could expect from his treatments.

The arguments are without merit. As *Rains* itself acknowledges (*Rains v. Superior Court*, *supra*, 150 Cal.App.3d at p. 941), the California Supreme Court in *Cobbs* circumscribed the parameters of a battery claim in this context, where a plaintiff has consented to particular treatment but is assertedly not advised of all potential complications. (*Rains*, at p. 941; see *Cobbs v. Grant*, *supra*, 8 Cal.3d at p. 240.) *Cobbs* does not permit Keehn to assert a claim for battery regardless of his consent. And Keehn's evidence does not implicate *Rains*, which involved fraudulent misrepresentations about a proposed procedure, which vitiated the patients' consent because it went to the " 'essential character of the act itself.' "[11] (*Rains*, at p. 941; see *Saxena v. Goffney*, *supra*, 159 Cal.App.4th at p. 327.) Here, Keehn presents no evidence that defendants made a misrepresentation going to the essential nature or character of the treatment—there is nothing indicating he failed to understand he was to undergo IPL treatment, indeed he expressly signed consent forms acknowledging such. Keehn's assertions that defendants

---

[11]    In *Rains*, psychiatrists obtained consent for treatment through misrepresentations about the therapeutic value of their services, when in fact they used the program as a pretext for other purposes, including to receive donations. (*Rains v. Superior Court*, *supra*, 150 Cal.App.3d at p. 936.) *Rains* held such allegations stated a claim for battery: "[T]he therapeutic versus nontherapeutic purpose of touching by a psychiatrist goes to the 'essential character of the act itself' and thus vitiates consent obtained by fraud as to that character." (*Id*. at p. 941.) The court explained that its conclusion was consistent with these principles because "where a physician intends to perform treatment for a nontherapeutic purpose when consent was given only for a therapeutic purpose" (*id*. at pp. 941-942), there has been an intentional deviation from the consent, as where a physician performs a wholly different treatment from that consented to. (*Ibid*.)

misrepresented the potential results of his treatment out a concern about generating a fee or for some other personal purpose (a theory that Keehn has forfeited by raising it for the first time in his reply brief, see *Nick v. City of Lake Forest* (2014) 232 Cal.App.4th 871, 879), or that he "did not understand the essential character of the invasive treatment," are both insufficient and unsupported by any evidence.

We conclude summary adjudication is proper on Keehn's battery cause of action. Given our conclusion, it is unnecessary to reach defendants' statute of limitations argument as to this claim.

DISPOSITION

The judgment is reversed and the matter remanded with directions that the trial court enter an order denying summary adjudication of Daniel Keehn's causes of action for negligence and professional negligence and granting summary adjudication of Keehn's claims for breach of contract and battery.  Keehn is entitled to his costs on appeal.

O'ROURKE, J.

WE CONCUR:

NARES, Acting P. J.

HALLER, J.